**LIQUILUX GAS SERVICES OF PONCE, INC., et al., Plaintiffs,**

v.

**TROPICAL GAS COMPANY, Inc., et al., Defendants.**

Civ. A. No. 32–61.

United States District Court
D. Puerto Rico.
Sept. 10, 1969.

Patrick Wilson, Ponce, P. R., for plaintiffs.

Arturo Estrella, San Juan, P. R., for defendants Baragaño, Trías, Saldaña and Francis.

## MEMORANDUM OPINION

CANCIO, Chief Judge.

Defendant Tropical Gas Company, Inc. ("Tropigas") moved to dismiss Counts I and II of the Amended and Supplemental Complaint pursuant to Rules 12(b) (1), 12(b) (6) and 12(h) (3) of the Federal Rules of Civil Procedure. The grounds for the motion, which are discussed more fully below, are that this Court lacks jurisdiction over the subject matter of these Counts and that these Counts fail to state claims upon which relief may be granted. Tropigas has also moved to strike from Count III of the Amended and Supplemental Complaint paragraphs 26(J) and 26(K) thereof, which in substance simply restate and incorporate by reference the allegations of Counts 1 and II.

Tropigas' defenses to Counts I and II concededly raise no issues of fact, and accordingly are appropriate for consideration at this time.

Counts I and II of the Amended and Supplemental Complaint purport to state claims for relief based upon alleged discriminations in price and services or facilities by defendant Tropigas, in violation of Sections 2(a) and 2(e) of the Clayton Act, as amended, 15 U.S.C. §§ 13(a), 13(e).[1] Specifically, it is alleged in paragraph 15 of Count I that Tropigas sold liquified petroleum gas ("LPG") to plaintiff Gas Ideal, Inc., at a price of 12½ cents per gallon, f. o. b. the Commonwealth Oil Refining Company facility at Guayanilla Bay, Puerto Rico, while at the same time selling a like grade and quality of LPG to Porto Rico Gas and Coke Company ("PRGC"), a regulated public utility located in San Juan, Puerto Rico, at a delivered price of 11⅞ cents per gallon. It is also alleged that Tropigas sold LPG "to other purchasers throughout Puerto Rico" on terms that discriminated against plaintiffs.

In paragraph 21 of Count II it is alleged that Tropigas discriminated against plaintiffs in favor of PRGC by installing and maintaining storage tanks "for the benefit of" PRGC, while not offering similar services to plaintiff.

In paragraphs 26(J) and 26(K) of Count III it is alleged that the unlawful discriminations alleged in Counts I and II were part of an attempt by Tropigas to monopolize the LPG business in Puerto Rico. The basic allegations of Count III allege violations of Sections 1, 2 and 3 of the Sherman Act and are not affected by Tropigas' present motion.

Tropigas' motion raises the question whether the Robinson-Patman Act presently has greater applicability within the Commonwealth of Puerto Rico than it does in a state. Defendant's contention is that the Robinson-Patman Act has *no* greater applicability in Puerto Rico than in a state and that therefore, under governing decisions interpreting the scope of the Robinson-Patman Act, the Court has no jurisdiction to grant relief on Counts

---

1. Section 2 of the Clayton Act, as amended, is commonly referred to as the "Robinson-Patman Act."

I and II of the Amended and Supplemental Complaint.

 Any finding that a party has unlawfully discriminated in price, services or facilities, in violation of Sections 2(a) and 2(e) of the Robinson-Patman Act, requires that at least one of the transactions forming the basis of the alleged discrimination be "in commerce." The term "commerce" is defined in Section 1 of the Clayton Act, 15 U.S.C. § 12, to mean, *inter alia*, trade or commerce *among* the several states, "or *within* * * * any Territory or any insular possession or other place under the jurisdiction of the United States." (Emphasis added.) Robinson-Patman cases arising in the mainland United States have made it clear that in order to satisfy the "in commerce" requirement of the Act, at least one of the transactions on which the discrimination is based must have crossed a state boundary. However, because a transaction *within* a territory or insular possession is, by definition, "in commerce," it may be presumed that the requirement of showing that a transaction crossed a boundary does not apply in the case of a territory or possession. In such a case a claim of unlawful discrimination can be based upon sales solely within the territory or possession.

Puerto Rico became a Commonwealth in 1952 following the adoption of a compact between the United States and the people of Puerto Rico. Section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734, provides that:

> [t]he statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States * * *.

Thus the specific question raised by this motion is whether the Robinson-Patman Act is presently to apply in Puerto Rico in the same manner as it applies in a state or whether it should be given greater applicability in Puerto Rico and apply as if Puerto Rico were still a territory or insular possession of the United States.

All of the transactions alleged in the Amended and Supplemental Complaint took place subsequent to 1952. If the Act is held to apply in the same manner as it applies to a state, plaintiffs must plead and prove that at least one of the transactions upon which the alleged violations of the Act are premised crossed the boundary of Puerto Rico. Inasmuch as Counts I and II of the Complaint plead transactions solely within Puerto Rico, and plaintiffs so concede, these Counts must be dismissed under such a holding. On the other hand, if Puerto Rico is held still to be a "territory or insular possession" under the Clayton Act definition of "commerce," the transactions alleged in the Complaint would be "in commerce," and the Robinson-Patman Act would have greater applicability in Puerto Rico than in a state.

Defendant's motion does not raise the broader question whether the Robinson-Patman Act applies to Puerto Rico. The Court assumes that this statute applies to a price discrimination involving Puerto Rico in any case where at least one of the transactions upon which the alleged violation is based is "in commerce." In short, the only issue presented on this motion is the present meaning of the words "in commerce" insofar as transactions wholly within Puerto Rico are concerned.[2]

---

2. Section 2(a) of the Robinson-Patman Act sets forth three distinct jurisdictional requirements that must be met before a person can be found to have engaged in an unlawful price discrimination thereunder:

 1. The person himself must be "engaged in commerce";

 2. The alleged discrimination must be committed "in the course of such commerce"; and

 3. "either or any of the purchases involved in such discrimination" must be "in commerce."

 It is only the third of these requirements that is of importance, for if a

A number of cases decided under the Act makes it clear beyond argument that a Robinson-Patman violation cannot be proved on the basis of transactions occurring solely within a single state. See, e. g., Hiram Walker, Inc. v. A&S Tropical, Inc., 407 F.2d 4 (5th Cir. 1969); Borden Co. v. FTC, 339 F.2d 953 (7th Cir. 1964); Jones v. Metzger Dairies, Inc., 334 F.2d 919 (5th Cir. 1964); Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943 (6th Cir. 1962), *cert. denied,* 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963); Central Ice Cream Co. v. Golden Rod Ice Cream Co., 287 F.2d 265 (7th Cir. 1961), *cert. denied,* 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961); Atlas Bldg. Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Center, Inc., 219 F.Supp. 400 (W.D.Pa.1963); Massachusetts Brewers Ass'n v. P. Ballantine & Sons Co., 129 F.Supp. 736 (D. Mass.1955); Myers v. Shell Oil Co., 96 F.Supp. 670 (S.D.Cal.1951); Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corp., 81 F.Supp. 547 (S.D.N.Y.1948), reversed on other grounds, 178 F.2d 150, 13 A.L.R.2d 358 (2d Cir. 1949); Lewis v. Shell Oil Co., 50 F.Supp. 547 (N.D. Ill.1943).

It is thus amply clear that if the Robinson-Patman Act is to apply in Puerto Rico in the same manner and with the same effect as it applies within a state, the Act is not violated unless at least one of the transactions involved crossed the boundaries of Puerto Rico. Transactions solely within Puerto Rico, such as those in this case, do not provide the basis for a violation.

As this Court recently noted in another case involving the applicability of federal antitrust laws in Puerto Rico, it is not necessary in this case "to delve into the question of the political status of Puerto Rico as a Commonwealth." David Cabrera, Inc. v. Unión de Choferes y Dueños, 256 F.Supp. 839, 842 (D.P.R. 1966). All that is called for here is an application of section 9 of the Puerto Rican Federal Relations Act.

It may be assumed that prior to 1952, the Robinson-Patman Act applied to transactions solely within Puerto Rico. Congress had defined the term "commerce" in Section 1 of the Clayton Act to include trade within any "territory or insular possession" of the United States, and cases decided during this period indicated that when Congress used such language in defining the scope of a statute it intended to exhaust its plenary power to legislate with respect to the subject matter of the statute concerned.

---

person makes a sale "in commerce," within the meaning of the third requirement, he is unnecessarily "engaged in commerce" and the transaction is "in the course of such commerce," within the meaning of the first two requirements. Rowe, Price Discrimination 78–79 (1962). Thus, the only relevant inquiry on this motion is whether "either or any" of the transactions alleged in Counts I and II were "in commerce."

It should be clearly understood that the "in commerce" requirement of Section 2 of the Clayton Act is far more strict than the jurisdictional standard that has been applied under the Sherman Act. A number of courts have also been careful to point out this difference between the scope of the Clayton and Sherman Acts. For example, in Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943, 946 (6th Cir. 1962),

*cert. denied,* 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963), the court said:

The cases recognize a distinction between the commerce which is covered by the Sherman Act and that covered by the Robinson-Patman Act. "In an action brought under the Robinson-Patman Act it is necessary to allege and prove that the transactions complained of are actually in interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have affected interstate commerce."

See also Bolick-Gillman Co. v. Continental Baking Co., 206 F.Supp. 151, 161 n. 12 (D.Nev.1961); Myers v. Shell Oil Co., 96 F.Supp. 670 (S.D.Cal.1951); Lewis v. Shell Oil Co., 50 F.Supp. 547, 549 (N.D.Ill.1943).

See Puerto Rico v. Shell Co. (P.R.), Ltd., 302 U.S. 253, 259, 58 S.Ct. 167, 82 L.Ed. 235 (1937); Cases v. United States, 131 F.2d 916, 923 (1st Cir. 1942), *cert. denied sub nom.* Velázquez v. United States, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943); *cf.* Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 52 S. Ct. 607, 76 L.Ed. 1204 (1932).

Thus, because *any* transaction in Puerto Rico was in "commerce", within the definition of the Clayton Act, it would follow that in the days prior to Commonwealth status the requirement of the Robinson-Patman Act that at least one transaction in an alleged price discrimination be "in commerce" was automatically satisfied.

However, since the attainment of Commonwealth status by Puerto Rico in 1952, and the adoption by the Puerto Rican people of their own Constitution, it has been consistently held that Puerto Rico must be viewed in the same manner as a state for the purpose of determining whether the "commerce" requirement of a particular pre-Commonwealth federal statute is satisfied. Transactions or occurrences in Puerto Rico that may have been considered to be in "commerce" under territorial status, by virtue of the plenary power of Congress to legislate for the territories, must, under Commonwealth status, be judged by the same standards that would apply in a state.

The constant theme that runs through the history of Puerto Rico's attainment of Commonwealth status is that Commonwealth represents the culmination of a process of increasing self-government over local affairs by the people of Puerto Rico. The preamble of Public Law 600, the foundation of the compact, notes that Congress "has progressively recognized the right of self-government of the people of Puerto Rico", and that under a series of Congressional enactments "an increasingly large measure of self-government has been achieved" by the people of Puerto Rico. The enacting clause of Public Law 600 states that the very purpose of that Act was to enable the Puerto Rican people to "organize a government pursuant to a constitution of their own adoption."

In the Constitutional Convention of Puerto Rico, resolutions were adopted in February 1952 that confirmed the understanding that Puerto Rico was to attain legislative autonomy in local matters. Resolution 22, for example, defined the term "commonwealth" as "a state which is free of superior authority in the management of its own local affairs." Resolution 23 declared that by the approval of a constitution "we attain the goal of complete self-government."

In transmitting the newly adopted Constitution to Congress, for its approval under the terms of Public Law 600, President Truman recognized that with such approval "full authority and responsibility for local self-government will be vested in the People of Puerto Rico." And in signing the Joint Resolution by which Congress approved the new Constitution, President Truman characterized the Resolution as "the culmination of a consistent policy of the United States to confer an ever-increasing measure of local self-government upon the people of Puerto Rico."

As this Court only recently said in Alcoa Steamship Co. v. Pérez, 295 F. Supp. 187, 197 (D.P.R.1968):

The Commonwealth of Puerto Rico is a body politic which has received, through a compact with the Congress of the United States, full sovereignty over its internal affairs * * *.

Thus, where a pre-Commonwealth federal law might validly have regulated internal commerce in Puerto Rico prior to 1952, by virtue of Congress' plenary power to make regulations for the territories or other places under United States jurisdiction, Congress, in entering into the compact, evidenced its intent not to apply federal regulations to strictly local matters within Puerto Rico.

This intent was expressed in the continuation by Congress of section 9 of the Jones Organic Act as part of the newly styled Puerto Rican Federal Relations Act. Section 9 prescribes in general how

all federal laws of general applicability are to apply in Puerto Rico after Commonwealth—they are to apply in the same manner as in the several States. While the wording of section 9 did not change from its original wording, that section clearly took on important new meaning in 1952.

In United States v. Figueroa Ríos, 140 F.Supp. 376 (D.P.R.1956), Judge Ruiz-Nazario handed down a landmark decision relating to the interpretation of Section 9 of the Federal Relations Act and applicability of pre-Commonwealth statutes in Puerto Rico. He held that Section 9

has acquired such a vitality after the establishment of the Commonwealth that it may be safely accorded, as regards the applicability to the Commonwealth of the statutory laws of the United States, a function which is substantially similar to the function of the Interstate Commerce Clause of the Constitution, as regards the relations between the Federal Government and the governments of the different states of the Union. 140 F.Supp. 376 at 381.

Although the Figueroa *Ríos* case dealt with the Federal Firearms Act, it has direct applicability to the present case. The Firearms Act made it a federal crime for a convict or a fugitive to transport a firearm "in interstate or foreign commerce," which was defined to include commerce "within any Territory or possession"—a definition substantially identical in this respect to the applicable definition under the Robinson-Patman Act. In Cases v. United States, 131 F.2d 916 (1st Cir. 1942), it had been held that the Firearms Act applied to the transportation of firearms solely within Puerto Rico. In Figueroa Ríos, however, the question was raised whether that Act continued to apply to transportation wholly within Puerto Rico after Commonwealth status.

After an exhaustive and careful consideration of Puerto Rico's status, the Court held the Firearms Act inapplicable to commerce *within* Puerto Rico. It stated that

if Congress had foreseen the Commonwealth of Puerto Rico, it would have so varied the [Firearms Act definition of "interstate and foreign commerce"] as to exclude it from the intra-territorial operation of the Firearms Act. * * * If only to be consistent, Congress would not have applied a section for the policing of areas with a classical territorial form of government, directly under Congressional government, to an area with its own constitution, subject to no supervision, in local matters, by the Federal government. *Thus, I must conclude that so much of [the Firearms Act] as defines "interstate or foreign commerce" as commerce "within any Territory or possession" is now locally inapplicable in Puerto Rico.* 140 F.Supp. at 381. (Emphasis added.)

This Court has had several recent occasions in antitrust cases to make clear that activity solely within Puerto Rico does not *ipso facto* satisfy the "commerce" requirements of the Sherman Act. In David Cabrera Inc. v. Unión de Choferes y Dueños, 256 F.Supp. 839 (D. P.R.1966), this Court pointed out that the Sherman Act applied in Puerto Rico with the same force and effect as in the United States, noting that the Act applied to any restrictive activities having a substantial effect upon interstate commerce. However, because the plaintiff in that case failed to show that the defendant's activity substantially affected interstate commerce, the Court dismissed the case for lack of jurisdiction. Implicit in this disposition was a holding that commerce solely within Puerto Rico is not automatically "commerce" within the meaning of the Sherman Act, for if it were there would have been no need to consider whether the defendant's activities affected commerce.

This Court has most recently reiterated this rule in Cooperativa de Seguros Múltiples de Puerto Rico v. San Juan, 289 F.Supp. 983 (D.P.R.1968). In this private antitrust action the defendants

moved to dismiss the complaint for failure to state a claim and for lack of subject matter jurisdiction. They argued that Sections 1 and 2 of the Sherman Act did not apply in Puerto Rico and, in any event, the case did not involve interstate commerce or any effect upon interstate commerce. This Court denied the motions, pointing out that the Sherman Act did apply in Puerto Rico to the same extent and in the same manner as if Puerto Rico were a state. Under this test the Court concluded that interstate commerce was involved.

It is most significant to note that in 25 cases [3] decided in a variety of forums since 1952 involving the applicability of pre-Commonwealth federal statutes to events in or citizens of Puerto Rico, pre-Commonwealth laws have been applied in precisely the same manner as they would have applied if the events had occurred in a state or the individuals had been citizens of a state. In those decisions in which Puerto Rico has been still referred to as a "territory", the result of that conclusion has been that the federal statute

involved was given the same effect with respect to Puerto Rico as in a state. Indeed, in every such case the result of a contrary conclusion would have been that Puerto Rican citizens would have received less protection under the federal law than citizens of a state.

In three of the cases decided since 1952, precisely the same issue was involved as is presented in this case, namely, whether, following the advent of Commonwealth status, a federal statute enacted in pre-Commonwealth days, defining commerce not only as trade between states but also as trade within a territory, still applies to purely intra-Puerto Rican activity by virtue of this definition.[4] In each of these cases the applicable statute, in addition to regulating interstate commerce, was intended to regulate purely internal commerce in pre-Commonwealth Puerto Rico, which of course, Congress was empowered to do. In each case the court held that following the creation of the Commonwealth it would be inconsistent with Commonwealth status for the federal law

3. Krisel v. Duran, 386 F.2d 179 (2d Cir. 1967), *cert. denied*, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968); Americana of Puerto Rico, Inc. v. Kaplus, 368 F.2d 431 (3rd Cir. 1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967); United States v. DeJesus, 289 F.2d 37 (2d Cir. 1961), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1254 (1961); Valpais v. United States, 289 F.2d 607 (1st Cir. 1961); Moreno Ríos v. United States, 256 F.2d 68 (1st Cir. 1958); Dario Sanchez v. United States, 256 F.2d 73 (1st Cir. 1958), *cert. denied*, 372 U.S. 931, 83 S.Ct. 877, 9 L.Ed.2d 734 (1963); Detres v. Lions Bldg. Corp., 234 F.2d 596 (7th Cir. 1956); Mora v. Mejías, 206 F.2d 377 (1st Cir. 1953); Feliciano v. United States, 297 F.Supp. 1356 (D.P.R.1969); Alcoa Steamship Co. v. Perez, 295 F. Supp. 187 (D.P.R.1968); Cooperativa de Seguros Múltiples de Puerto Rico v. San Juan, 289 F.Supp. 983 (D.P.R. 1968); United States v. Valentine, 288 F.Supp. 957 (D.P.R.1968); David Cabrera, Inc. v. Unión de Choferes y Dueños, 256 F.Supp. 839 (D.P.R.1966); Securities and Exchange Commission v. Quing N. Wong, 252 F.Supp. 608 (D. P.R.1966); Kane v. Republica De Cuba, 211 F.Supp. 855 (D.P.R.1962); Lummus Co. v. Commonwealth Oil Refinery Co., 195 F.Supp. 47 (S.D.N.Y.1961); Trigo Bros. Packing Corp. v. Davis, 159 F. Supp. 841 (D.P.R.1958), vacated on other grounds, 266 F.2d 174 (1st Cir. 1959); Mitchell v. Rubino, 139 F.Supp. 379 (D. P.R.1956); United States v. Figueroa Ríos, 140 F.Supp. 376 (D.P.R.1956); United States v. Mejías, 131 F.Supp. 957 (D.P.R.1955); Cosentino v. International Longshoremen's Ass'n, 126 F.Supp. 420 (D.P.R.1954); Carrión v. González, 125 F.Supp. 819 (D.P.R.1954); Arbona v. Kenton, 126 F.Supp. 366 (S.D.N.Y.1954); Mora v. Mejías, 115 F.Supp. 610 (D.P. R.1953); Hilton Hotels International Inc., 37 L.R.R.M. 1474 (P.R.Lab.Rel.Bd. 1955).

4. United States v. Figueroa Ríos, 140 F. Supp. 376 (D.P.R.1956) (Federal Firearms Act); Trigo Bros. Packing Corp. v. Davis, 159 F.Supp. 841 (D.P.R.1958), vacated on other grounds, 266 F.2d 174 (1st Cir. 1959) (Federal Alcohol Administration Act); and Hilton Hotels International, Inc., 37 L.R.R.M. 1474 (P.R. Lab.Rel.Bd.1955) (Labor Management Relations Act of 1947).

to continue to have greater applicability in Puerto Rico than in a state.

If this Court were to construe the Robinson-Patman Act as being applicable to the wholly local Puerto Rican transactions alleged in Counts I and II of the Amended and Supplemental Complaint, this would be the first case in 17 years in which a pre-1952 federal statute was given greater applicability in Puerto Rico than it would have in a state.

It would be manifestly inconsistent with Puerto Rico's present status as a self-governing Commonwealth to hold that the Robinson-Patman Act has greater applicability in Puerto Rico than in the States to an alleged discrimination based upon a comparison of purely local transactions. As noted, Congress intended in 1936 not to extend federal authority to sales made by a seller within a single state. The cases have repeatedly reaffirmed this intention of Congress, and among such cases are at least two that presented situations markedly similar to those presented in this case. In Myers v. Shell Oil Co., 96 F.Supp. 670 (S.D. Cal.1951), the defendant, Shell, refined oil in California. In a price discrimination case brought by one of its customers in California, the court held that the "in commerce" requirement of the Act had not been satisfied.

Similarly, in Lewis v. Shell Oil Co., 50 F.Supp. 547 (N.D.Ill.1943), the complaint was dismissed where it alleged a price discrimination by Shell among customers in Illinois, and Shell sold to its Illinois customers solely from a bulk plant and refinery located in Illinois.

At least 25 states have adopted general price discrimination statutes to fill the area reserved by our constitutional scheme to local regulation, and 46 states have adopted legislation outlawing discriminatory pricing practices in specific industries. 1 CCH Trade Reg.Rep. ¶¶ 3510, 3514. Even more notable is the fact that in 1964 Puerto Rico adopted its own anti-monopoly law containing, in Section 7 thereof, a price discrimination provision clearly applicable to transactions such as those alleged in this case. To hold the Robinson-Patman Act applicable to transactions occurring solely within Puerto Rico would not only deny Puerto Rico's status as a self-governing entity, empowered to take such measures as it sees fit with respect to purely local matters, but would also cause a needless and confusing overlap between the Robinson-Patman Act and the Puerto Rican statute.

Prior to 1950 it may have been appropriate to apply the Robinson-Patman Act to all local transactions that Congress could have reached under its plenary power to legislate for Puerto Rico. After the creation of the Commonwealth, however, local transactions such as those involved in this case "are to be dealt with by the Commonwealth under its own Constitution and internal laws." 140 F.Supp. at 381. To hold otherwise would be frustrative of the very purpose for which the Commonwealth was created.

### Conclusion

For the foregoing reasons an Order will be entered dismissing Counts I and II of the Amended and Supplemental Complaint and striking from Count III paragraphs 26(J) and 26(K) which incorporate Counts I and II by reference.