**CORDOVA & SIMONPIETRI INSUR-
ANCE AGENCY INC., et al.,
Plaintiffs, Appellants,**

v.

**CHASE MANHATTAN BANK N.A., et
al., Defendants, Appellees.**

No. 80–1350.

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1981.
Decided May 19, 1981.

Gilberto Mayo Aguayo, Hato Rey, P. R., with whom Cancio, Cuevas & Mayo, Hato Rey, P. R., was on brief, for plaintiffs, appellants.

Jay A. Garcia Gregory, San Juan, P. R., with whom Fiddler, Gonzalez & Rodriguez, San Juan, P. R., was on brief, for defendants, appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Plaintiffs brought an antitrust action alleging that defendants entered into an agreement violating sections 1 and 3 of the Sherman Act.[1] Section 1 forbids agreements "in restraint of trade or commerce among the several States"; section 3 forbids agreements "in restraint of trade or commerce in any Territory of the United States." The district court dismissed the complaint, holding that plaintiffs did not make sufficient showing of an effect upon interstate commerce to fall within the reach of section 1, and that, in light of the change in Puerto Rico's status from "territory" to "Commonwealth", section 3 no longer applies to Puerto Rico. We affirm the judgment of the district court.

## I.

Plaintiffs are an insurance broker and its president who, among other activities, arranged for automobile dealers to obtain "single interest" insurance policies. These policies insure a dealer against loss of the unpaid amount of the loan on each car that he sells. If, for example, a customer buys a $5,000 car, finances it with a $3,000 loan, and then refuses to pay the loan, the policy satisfies the dealer's obligation on the loan and would pay $3,000 directly to the bank that had financed the purchase of the car. Typically, these policies are issued under a master agreement, insuring loans on all cars sold by the dealer, financed through whatever bank is the dealer's customary source of funds.[2]

Plaintiffs claim that they were the agent (or broker) for two car dealers who obtained their financing for auto sales from the Puerto Rico branch of the Chase Manhattan Bank. In seeking policies, plaintiffs, as a broker, would contact a general agent ("Benitez") who, in turn, obtained the policies from Puerto Rico Fire and Casualty Company. Evidently, Chase, the ultimate beneficiary of the policies, approved the arrangement.

Plaintiffs' antitrust claim, in essence, asserts that after Puerto Rico Fire and Casualty cancelled the policies because of losses,[3] Chase and Puerto Rico Fire and Casualty agreed with each other to reinstate the policies, but without making use of plaintiffs' brokerage services. Rather, the auto dealers were to place their order for policies directly through Benitez, Puerto Rico Fire and Casualty's general agent. Plaintiffs assert

---

1. Plaintiffs also alleged a violation of section 2 of the Sherman Act, but alleged no facts sufficient to make out a separate offense. This allegation adds nothing to the issue whether an effect on "commerce" must be established under sections 1, 2 and 3.

2. The bank would seem to be the primary beneficiary of the policy; presumably the dealer is the purchaser of the policy because the policy proceeds satisfy the dealer's liability to the bank for the remainder due on the car customer's defaulted loan.

3. It is not completely clear from the record whether Puerto Rico Fire and Casualty cancelled the policies, which it had a right to do, or merely threatened to cancel.

that this arrangement among Chase, Benitez, Puerto Rico Fire and Casualty (and presumably the auto dealers) amounts to an agreement in restraint of trade, injuring competition in the Puerto Rico "single interest" insurance policy business and depriving plaintiffs of commissions.

After depositions were taken and a pretrial order was approved, defendants moved to dismiss the complaint for lack of subject matter jurisdiction. They claimed an inadequate showing of effect upon interstate commerce. Plaintiffs' reply referred to evidence in the depositions, which stated that the Puerto Rico insurance companies reinsured policies on the mainland United States, and plaintiffs attached two exhibits purporting to demonstrate this reinsurance. After reviewing the motion, response, and this evidence on "commerce effects", the district court dismissed the complaint.

## II.

The first, and most important, question that this case presents is whether section 3 of the Sherman Act applies to Puerto Rico. If so, no effect on interstate commerce need be shown, for section 3 governs restraints of trade *within* "any territory". The Supreme Court, in 1937, specifically held that section 3 applied to Puerto Rico. *Puerto Rico v. Shell Co.*, 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937). But, in 1951 Congress passed the Puerto Rican Federal Relations Act, 64 Stat. 319, ("FRA") pursuant to which Puerto Rico adopted its own Constitution. Does the coming into effect of the FRA and this Constitution mean that certain federal acts, such as the Sherman Act, which apply *within territories* but not *within states*, can no longer be given greater

effect as applied to Puerto Rico than as applied to states of the Union? Chief Judge Magruder first posed this question in 1953.[4] This court discussed the question, but did not answer it definitively, in *Mora v. Mejias*, 206 F.2d 377 (1st Cir. 1953).[5] Subsequently, the District Court for the District of Puerto Rico in a series of opinions refused to apply to "intra-commonwealth" activities the Federal Firearms Act, the Federal Alcohol Administration Act, and the Sherman Act—all statutes which, by their terms, apply to "intra-territory", but not to "intra-state", activities.[6] These district court judges reasoned that, for purposes of these statutes, the Commonwealth of Puerto Rico is to be treated like a state and not like a territory. The district court in this case followed their approach. We hold that the district court is correct.

### A.

Whether Puerto Rico is now to be treated as a state or a territory for purposes of the Sherman Act

> depends upon the character and aim of the act. Words generally have different shades of meaning and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed.

*Puerto Rico v. Shell Co.*, 302 U.S. at 258, 58 S.Ct. at 169. Using these criteria, the Court, in *Shell*, held that Sherman Act section 3 *did* apply to Puerto Rico and coexisted with Puerto Rico's own local antitrust

---

4. Magruder, *The Commonwealth Status of Puerto Rico*, 15 U.Pitt.L.Rev. 1 (1953).

5. *See also Caribtow Corp. v. Occupational Safety & Health Review Commission*, 493 F.2d 1064, 1068 n.10 (1st Cir. 1974) (question whether Congress has power to legislate concerning purely local Puerto Rico matters where it could not do so as to a state not reached).

6. Federal Firearms Act: *United States v. Figueroa Rios*, 140 F.Supp. 376, 381 (D.P.R.1956.) Federal Alcohol Administration Act: *Trigo*

*Bros. Packing Corp. v. Davis*, 159 F.Supp. 841 (D.P.R.1958), *vacated on other grounds*, 266 F.2d 174 (1st Cir. 1959). Sherman Act: *Truxes v. Rolan Electric Corporation*, 314 F.Supp. 752, 757 (D.P.R.1970); *Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Company*, 303 F.Supp. 414, 419 (D.P.R.1969); *Cooperation de Seguros Multiples de Puerto Rico v. San Juan*, 289 F.Supp. 983, 987 (D.P.R.1968); *David Cabrera, Inc. v. Union de Chofres y Duenos*, 256 F.Supp. 839 (D.P.R.1966).

law. The Court noted that Congress wished to deal comprehensively with restraints of trade, that it wished to exercise all the constitutional power that it possessed, *see Atlantic Cleaners and Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932), and that there "is no reason why Puerto Rico should not be held to be a 'territory' within the meaning of section 3 of the Sherman Act." *Puerto Rico v. Shell Co.*, 302 U.S. at 259, 58 S.Ct. at 170. The *Shell* Court was considering, however, whether the Sherman Act's framers would have intended it to apply to Puerto Rico as a "territory" *or not to apply at all.*

We consider the quite different question of whether the Sherman Act's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a "state" or "territory" under the Act. And, we consider that question in light of the subsequent enactment into law of the Federal Relations Act and the promulgation of the Puerto Rico Constitution. Did these subsequent events so change the legal status of Puerto Rico that the *Shell* decision no longer has effect?

## B.

The FRA and the Puerto Rico Constitution were intended to work a significant change in the relation between Puerto Rico and the rest of the United States. In its last years of Spanish rule Puerto Rico had achieved a measure of independence,[7] but, under the Treaty of Paris, which ceded Puerto Rico to the United States, the island lost its autonomy. It became a "territory" of the United States[8] and subject to the command of Congress.[9] From 1900 to 1917, Puerto Rico was governed by the First Organic Act,[10] which created a body politic known as the "People of Porto Rico", imposed a short-lived tariff, and made no provisions for United States citizenship.[11] In 1917, Congress enacted a Second Organic Act,[12] providing for a greater measure of self-government.[13] The Second Organic Act contained a bill of rights[14] and a grant of collective United States citizenship to the people of Puerto Rico.[15] In the Supreme Court's view, the effect of these acts was to give Puerto Rico a legislative autonomy similar to that of the states in local matters. *Puerto Rico v. Shell Co.*, 302 U.S. at 261–63, 58 S.Ct. at 171–172. Yet, Congress retained major elements of sovereignty. In cases of conflict, Congressional statute, not Puerto Rico law, would apply no matter how local the subject;[16] and Congress insisted that acts of the Puerto Rico legislature be reported to it, retaining the power to disapprove them.[17] Those federal acts applying to territories by and large applied to Puerto

---

7. Puerto Rico had become a semi-autonomous overseas province of the Kingdom of Spain. Royal Decree of November 25, 1897, *Constitution Establishing Self-Government in the Island of Puerto Rico by Spain in 1897*, Documents on the Constitutional History of Puerto Rico (1948).

8. Under Article II of the Treaty of Paris, Spain ceded the island of Puerto Rico to the United States, and in Article IX it was provided that, "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." 30 Stat. 1754, 1759 (1899).

9. U.S. Constitution, Article IV, § 3, Clause 2; *see also* Article 1, § 8, Clause 18; *see generally*, Cabranes, *Citizenship and the American Empire*, 127 U.Pa.L.Rev. 391 (1978).

10. Popularly known as the Foraker Act, 31 Stat. 77 (1900).

11. Estrella, *The Antitrust Law in Puerto Rico*, 28 Revista del Colegio de Abogados de Puerto Rico 505 (1968).

12. Popularly known as the Jones Act, 39 Stat. 951 (1917).

13. Committee on Interior and Insular Affairs, *Puerto Rico—A Survey of Historical, Economic and Political Affairs*, U.S. House of Representatives (1959) at 6.

14. Section 2 of the Jones Act, 39 Stat. at 951.

15. Section 5 of the Jones Act, 39 Stat. at 953.

16. Sections 37 and 57 of the Jones Act, 39 Stat. at 964, 968.

17. Section 34 of the Jones Act, 39 Stat. at 961.

Rico.[18]  Thus, prior to 1950, Puerto Rico's legal status was closer to that of a "territory" than of a "state".[19]

The FRA was intended to end this subordinate status.  It was introduced into the House of Representatives by the Puerto Rico resident commissioner on March 13, 1950.  It was titled, "A bill to provide for the organization of a constitutional government by the People of Puerto Rico".[20]  It was approved by the 81st Congress as Public Law 600.[21]  A short preamble suggested that its object was to provide additional self-government.[22]  After a favorable vote on the Act, a constitutional convention was held in Puerto Rico.  A constitution was adopted with support of a majority of the voters of Puerto Rico and, upon recommendation of the President, Congress approved the Constitution as a "compact" with the people of Puerto Rico on July 3, 1952.[23]

The theme that consistently runs throughout the legislative history of Puerto Rico's attainment of Commonwealth status is that Commonwealth represents the fulfillment of a process of increasing self-government over local affairs by the people of Puerto Rico.  The preamble of Public Law 600 notes that Congress "has progressively recognized the right of self-government of the people of Puerto Rico."  The Senate Report accompanying S.3336 stated that the Organic Act of 1917 ensured "almost complete political and economic autonomy", whereas "*This measure is designed to complete the full measure of local self-government in the island . . . .*"  The Report noted that the compact was "a logical step in the process of political freedom and economic development."[24]

In the Constitutional Convention of Puerto Rico, resolutions were adopted in February 1952 that confirmed the understanding that Puerto Rico was to attain legislative autonomy in local matters.  Resolution 22, for example, defined the term "commonwealth" as "a state which is free of superior authority in the management of its own local affairs."  Resolution 23 declared "that by the approval of a constitution we attain the goal of complete self-government".[25]

In transmitting the newly adopted Constitution to Congress, President Truman recognized that with such approval "full authority and responsibility for local self-government will be vested in the people of Puerto Rico."  And in signing the joint resolution by which Congress approved the new Constitution, President Truman characterized the Constitution as the "culmination of a consistent policy of the United States to confer an ever-increasing measure of local self-government upon the people of Puerto Rico."[26]

Prior to approval of the Puerto Rico Constitution the United States had regularly transmitted to the Secretary General of the United Nations statistical and other information of a technical nature relating to economic, social and educational conditions in Puerto Rico pursuant to Article 73 of the U.N. Charter.  Article 73 requires such reports from members who have assumed responsibilities "for the administration of territories whose people have not yet attained

---

**18.**  *See Puerto Rico v. Shell Co.*, 302 U.S. at 257–59, 58 S.Ct. at 169–170.

**19.**  *Mora v. Mejias*, 206 F.2d 377, 386–88 (1st Cir. 1953).

**20.**  H.R. 7674, 81st Cong.2d Sess. Introduced in the Senate as S.3336.

**21.**  64 Stat. 319;  48 U.S.C. §§ 731b–e.

**22.**  *Id.*

**23.**  Pub.L.No.477, 82nd Cong., 66 Stat. 327. Congressional approval was conditioned on requirements that amendments to the Puerto Rico Constitution be consistent with the United States Constitution, the Puerto Rican Federal Relations Act, and Public Law 600.  All such conditions were adopted and approved by the Puerto Rico Constitutional Convention and a second referendum.

**24.**  Senate Report No. 1779, 81st Cong., 2d Sess., June 6, 1950 at 2 (emphasis added).

**25.**  Quoted in *Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Company*, 303 F.Supp. 414, 418 (D.P.R.1969).

**26.**  *Id.*

the full measure of self-government."[27] Shortly after approval of the Constitution, the United States advised the U.N. that it would no longer report with respect to Puerto Rico since Puerto Rico was now a self-governing territory.[28]

The internal policy of the executive branch was consistent with this statement. For example, in 1961, President Kennedy sent a memorandum to all heads of the executive departments and agencies, which stated in part:

The Commonwealth structure, and its relationship to the United States which is in the nature of a compact, provide for self-government in respect of internal affairs and administration subject only to applicable provisions of the Federal Constitution, the Puerto Rican Federal Relations Act, and the acts of Congress authorizing and approving the constitution.

On November 27, 1953, the General Assembly of the United Nations recognized that the people of the Commonwealth of Puerto Rico, exercising effectively the right of self-determination in a free and democratic way, had achieved a new constitutional status and that, in view of this new status, it was appropriate that the United States should cease the transmission of information with regard to Puerto Rico under Article 73(e) of the Charter. U.N.Cen.Ass.Res. 748 (VIII) (1953) . . . .

All departments, agencies, and officials of the executive branch of the Government should faithfully observe and respect this arrangement in relation to all matters affecting the Commonwealth of Puerto Rico. If any matters arise involving the fundamentals of this arrange-

ment, they should be referred to the Office of the President.

Memorandum of July 25, 1961, 26 Fed.Reg. 6695.

In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens. As the Supreme Court has written, "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a State of the Union . . . ." *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976).

■ The significance of this change from the point of view of the Sherman Act arises out of the fact that, as a general matter, the Sherman Act ceases to apply to purely local affairs once territories become states, leaving state governments free to enact various local antitrust laws broadly consistent with general federal policy, but occasionally divergent as to details.[29] The local Puerto Rico antitrust act, though virtually identical to the federal act at the time *Shell* was decided, was subsequently modified and has ceased to replicate federal law in

---

**27.** U.N. Charter Article 73(e).

**28.** Memorandum by the Government of the United States of America concerning the Cessation of Transmission of Information under Article 73(e) of the Charter with regard to the Commonwealth of Puerto Rico. Annex II, U.N. Doc. A/Ac.35/L.121 at 8 (1953). *See generally* Magruder, *The Commonwealth Status of Puerto Rico*, 15 U.Pitt.L.Rev. 1, 12–13 (1953). The memorandum stated:

. . . Congress has agreed that Puerto Rico shall have, under that Constitution, freedom from control or interference by the Congress in respect of internal government and admin-

istration, subject only to compliance with applicable provisions of the Federal Constitution, the Puerto Rican Federal Relations Act and the acts of Congress authorizing and approving the Constitution, as may be interpreted by judicial decision. Those laws which directed or authorized interference with matters of local government by the Federal Government have been repealed.

**29.** *See Coyle v. Oklahoma*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911); *Moore v. United States*, 85 F. 465 (8th Cir. 1898).

every detail.[30] The states are clearly able to adopt such variations as to purely local matters. And, there is no reason of policy discernible in the Sherman Act for treating Puerto Rico differently, given a general Congressional intent to grant Puerto Rico state-like autonomy.[31] We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state. Thus, it is fair to assume that the framers of the Sherman Act, had they been aware of the FRA and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a "state" under the Act, once Commonwealth status was achieved.

This holding is consistent with that of the Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). There, the Court considered whether Puerto Rico was a "state" for the purposes of 28 U.S.C. § 2281, which required a three-judge court for a proceeding seeking to enjoin the operation of a "state statute" as unconstitutional. The Court noted that before 1950 the courts had held that this statute did not apply to Puerto Rico because it was a territory, not a state. But, the FRA and Constitution changed Puerto Rico's status so that the statute, applicable to states, applied to Puerto Rico as well. Similarly, as previously pointed out, when lower courts have considered other statutes that apply to intraterritorial, but not to intra-state, transactions, they have held that after 1952, Puerto Rico is to be treated as a state and not a territory. *United States v. Figueroa Rios*, 140 F.Supp. 376 (D.P.R.1956) (Federal Firearms Act); *Tirgo Bros. Packing Corp. v. Davis*, 159 F.Supp. 841 (D.P.R.1958), *vacated on other grounds*, 266 F.2d 1974 (1st Cir. 1959) (Federal Alcohol Administration Act). And, the National Labor Relations Board has held the same in respect to the Labor Management Relations Act of 1947. *Hilton Hotels International, Inc.*, 37 L.R.R.M. 1474 (P.R.Lab.Rel.Bd.1955).[32]

---

**30.** The Puerto Rico Anti-Monopoly Act of 1964 (Act No. 77 of June 25, 1964) superseded the Puerto Rico Act of March 14, 1907, and draws heavily on federal legislation. However, there are important differences. For example, the prohibition of restraints of trade in the Puerto Rico Act is expressly limited to "unreasonable" restraints. *But see Standard Oil v. U. S.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The Puerto Rico Act's anti-merger provision extends to acquisitions by "any person", defined to include natural persons and unincorporated associations, which were not included within the comparable provision of the Clayton Act. The Puerto Rico Act's anti-merger provisions also exempt asset acquisitions which are for the purpose of developing new local industries. There is no comparable provision under federal law. *See generally* Estrella, *Antitrust Law in Puerto Rico*, 28 Revista del Colegio de Abogados de Puerto Rico 505, 580–709 (1968).

**31.** The application of section 2 of the Sherman Act to Puerto Rico is a different matter, for there is no comparable provision in section 3 to the section 2 prohibition of monopolization. Whether section 2 applies to Puerto Rico following Commonwealth status, when no equivalent prohibition applied before it, is an issue not before us and not briefed. Consideration of such an issue would require, among other things, exploration of the reasons why Congress chose not to extend such a prohibition to the territories.

**32.** We find nothing to the contrary in *First Federal Savings and Loan Association of Puerto Rico v. Hector L. Ruiz de Jesus*, 644 F.2d 910 (1st Cir. 1981). In that case, we held that post-1952 Banking Act amendments did not alter the scope of section 632 of the federal banking code, 12 U.S.C. § 632. Section 632, enacted in 1933, grants federal question jurisdiction to district courts in all civil suits involving "international or foreign banking, or banking in a dependency or insular possession of the United States . . ." where a federally chartered corporation is a party to the suit. Post-Commonwealth Banking Act amendments did not reflect any congressional intent to narrow this grant of jurisdiction by discontinuing federal question jurisdiction in civil cases involving banking in Puerto Rico where a federally chartered corporation is a party. And, Commonwealth status itself, although it established the full measure of local self-government, did not necessarily withdraw this jurisdictional grant. Such a grant, in contradistinction to congressional regulation of local affairs, does not threaten the balance between federal prerogatives and local autonomy. Although there is not a parallel grant of jurisdiction over banking transactions in a state where a federally chartered corporation is a party, that fact alone

### C.

The result that we reach here can be supported as well by two other independent lines of argument. First, Section 6 of the Federal Relations Act states that all federal "laws or parts of laws inconsistent with the provisions of this Act are hereby repealed." [33] A strong argument can be made that Sherman Act section 3, as applied to intra-commonwealth transactions, is inconsistent with the autonomy that the FRA grants, and it is, therefore, repealed.

Second, the Sherman Act applies to Puerto Rico by virtue of a provision originally contained in the Foraker Act of 1900, reenacted in the Second Organic Act of 1917, and reenacted again as section 9 of the FRA—a provision that states "The statutory laws of the United States *not locally inapplicable*, ... shall have the same force and effect in Puerto Rico as in the United States ...." (Emphasis added.) One could claim that the "intra-territorial" aspect of Sherman Act section 3 is now "locally inapplicable" to Puerto Rico. This argument has some force, for an examination of the history of the "locally inapplicable" language reveals a design to defer to local legislatures in local matters and an intent to interpret the phrase dynamically: [34]

does not suggest that, as a matter of comity, section 632 no longer applies to Puerto Rico. Among other things, its history, language and mercantile custom may, in Congress' view, render Puerto Rico sufficiently different as to merit availability of a federal forum for a federally chartered corporation banking there. *Cf.* 12 C.F.R. § 211.2(a), 213.2(b) (1979); 12 C.F.R. § 211.2(f) (1980) (Federal Reserve Board regulations which define the terms "foreign", "foreign country" and "abroad" to include the Commonwealth of Puerto Rico). Such a result respects the interests of both sovereigns. Finally, there have been different historical understandings with respect to section 3 of the Sherman Act and section 632 of the federal banking code. The Puerto Rico District Court held soon after Commonwealth status that section 3 of the Sherman Act no longer applied to Puerto Rico, whereas that court and this court until quite recently assumed that section 632 continued to apply to banking transactions in Puerto Rico.

33. Pub.L.No.600 § 5, 64 Stat. 320, continuing in force section 58 of the Second Organic Act, and Pub.L.No.600 § 6, 64 Stat. 320.

34. The phrase "not locally inapplicable" originated in Henry Clay's Report of the Committee of Thirteen, the proposed Compromise of 1850. As part of the settlement of the clash of interests sparked by the Wilmot Proviso (a proposed Congressional ban of slavery in New Mexico and other territories), the Compromise was silent on introduction of the "local" institution of slavery to these territories. The Southern view was that changing social and economic conditions (including adaptation to dry soil) might bring about slavery in New Mexico, perhaps supported by retained Mexican law and custom. In addition, the Southern view held that the territorial legislature should be free to recognize and support slavery even if such territorial law thereby superseded general federal law dealing with personal rights. Of course, the North differed strongly on the propriety of establishing slavery in New Mexico and took its chances on the dry soil and local sentiment. Thus, the phrase "not locally inapplicable" was viewed by its Southern proponents as a means by which New Mexico, should it choose to do so, could adopt slavery despite general federal laws dealing with personal rights. And, the Northerners apparently considered it sufficiently ambiguous as to minimize its import. The phrase "not locally inapplicable" (and elimination of the Wilmot Proviso) expressly left the issue of slavery in New Mexico to be determined by developing local social, economic and legislative conditions, and, thereby, staved off the political crisis that enveloped the nation several years later.

This history of the compromise language is perhaps of some continuing significance. Senator Foraker, in 1900, deliberately chose this model (rather than following the simpler Wisconsin territorial act model—"so far as ... may be applicable"). His choice reflects, if anything, a more, rather than less, deferential view of the effect of local social, economic and legislative developments on general federal law. In sum, the phrase reflects at least some intent that not only developing social and economic conditions but also emerging territorial self-government could render general federal law inapplicable. *Cf. United States v. Ferrer*, 613 F.2d 1188, 1192–93 (1st Cir. 1980) (Puerto Rico has authority to enact local legislation inconsistent with federal maritime legislation). For the history of the phrase "not locally inapplicable", *see Congressional Globe*, 31 Cong. 1st Sess. 944–48 (May 8, 1850) (H. Clay); Hamilton, *Prologue to Conflict, the Crisis and Compromise of 1850* 89, 146–47, 204 (1964); *Congressional Globe*, 31 Cong. 1st Sess. 59, 72–73, 436–39, 461, 508–10, 567–73, 587, 592; *Appendix* 612–16, 902, 911, 1104–06, 1118, 1120, 1134, 1145–46, 1519–61, 1581–1630. The Wisconsin provision is set forth in Act of April 20, 1836, ch. 54 § 12, 5 Stat. 15. For Senator

changing events, such as enactment of a different local antitrust law or the change in the island's legal status, might well make Sherman Act section 3 "locally inapplicable" today though it was applicable at the time of the *Shell* decision in 1937. Given our holding, we do not believe it necessary to explore these theories in detail, or to choose among them, for the same functional considerations underlie the application of these latter two theories as underlie the first, namely, a significant change in the degree of autonomy exercised by Puerto Rico over local affairs and the lack of any strong reason why the Sherman Act should apply to purely local matters in Puerto Rico but not the states. These considerations lead us to conclude that Sherman Act section 3 does not apply to Puerto Rico, whether one bases the result on a view of the "intent" of the Sherman Act's framers, on a "repeal" of inconsistent law implicit in FRA section 6, or on the view that section 3 is now "locally inapplicable" while section 1 is not. In other words, all roads lead to Rome.[35]

### III.

■■■ The district court also held that plaintiffs failed to make a sufficient showing of impact upon "interstate commerce" to bring defendants' alleged conduct within Sherman Act sections 1 and 2. It is well established that to satisfy the "interstate commerce" requirements of these provisions, the challenged activity must either occur "*in* interstate commerce" or "while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980). To show that the activity is "in" interstate commerce, plaintiffs would have to demonstrate, at least, that defendants' single interest insurance business "is an integral part" of an interstate transaction. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975). They do not claim that they can do so.

Rather, plaintiffs rely upon the second branch of the test and argue that they can show the defendants' activities significantly "affect" interstate commerce. The Supreme Court recently discussed this test in *McLain*, where it stated that in showing a connection between defendants' activities and interstate commerce, plaintiffs need not show that defendants' unlawful conduct "itself had an effect" upon interstate commerce. The Court wrote:

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the

Foraker's report, *see* Temporary Civil Government for Puerto Rico, Report of the Committee on Public Lands and Puerto Rico to Accompany S.2264, S.Rep.No.249, February 5, 1900 at 5–6. On the Mexican law and Kearney Military Code as sources of New Mexico Territorial law, *see Leitensdorfer v. Webb*, 1 N.M. 34, 55 (1853), *aff'd* 61 U.S. 176, 20 How. 176, 15 L.Ed. 891 (1857); *see also* Rodriguez-Antongiorgi, *Review of Federal Relations on the Applicability of the United States Laws in Puerto Rico Subsequent to the Establishment of the Commonwealth in Puerto Rico*, 26 Rev.Jur.U.P.R. 321, 343 (1957). On the use of the provision "not locally inapplicable" in other contexts, *see Examining Board v. Flores De Otero*, 426 U.S. 572, 588–89 n.20, 96 S.Ct. 2264, 2274–75 n.20, 49 L.Ed.2d 65 (1976), and *see also, e. g.*, 31 Stat. 141 (Hawaii), 37 Stat. 512 (Alaska), and *Shuttle Corp. v. Transit Commission*, 393 U.S. 186, 196 n.*, 89 S.Ct. 354, 360 n.*, 21 L.Ed.2d 334 (1968) (District of Columbia). For another

expansive view of territorial legislative power over "local" matters and a limited view of Congressional power to legislate for the territories *see* Mr. Justice Campbell's concurring opinion in *Dred Scott v. Sandford*, 60 U.S. 393, 513–14, 19 How. 393, 513–14, 15 L.Ed. 691 (1856). Finally, for a discussion of the scope of the exception to federal law encompassed by the provision "not locally inapplicable", *see* Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 56 Geo.L.J. 221, 234–39 (1967).

**35.** Whatever special considerations might move a court to hold that Congress did not intend section 2 of the Sherman Act to apply to Puerto Rico, *see* note 31 *supra*, would also lead a court to say that the FRA was not "inconsistent" with the nonapplication of section 2 or that section 2 was still "locally inapplicable". Again, all roads lead to Rome.

more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases. *See American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 225, n.59, 60 S.Ct. 811, 846 n.59, 84 L.Ed. 1129 (1940).

*McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. at 242–43, 100 S.Ct. at 509–510.

While the Court's language is somewhat ambiguous, its specific reference to "respondents' brokerage activity" would seem to require plaintiffs in that price-fixing case to do more than simply point to some aspect of defendants' business which involves interstate commerce. Were so minimal a showing sufficient, the most local of conspiracies would fall inside, or outside, the Sherman Act, depending upon the fortuitous circumstance of whether a defendant firm happened to be owned by an interstate conglomerate. The Court does not sanction that result. Rather, its opinion simply emphasizes that a plaintiff need not prove that a defendant's unlawful activities *actually* affected interstate commerce; [36] but it goes on to suggest that defendants' business still must be so connected with interstate commerce that it is logical, as a matter of practical economics, to believe that the unlawful activity will affect interstate com-

merce. Thus, the Court speaks of "the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. at 246, 100 S.Ct. at 511, citing *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976). This interpretation of *McLain* has been followed by the Tenth Circuit, which wrote that "for jurisdictional purposes a plaintiff must point to the relevant channels of interstate commerce logically affected by the defendant's unlawful conduct." *Crane v. Intermountain Health Care*, 1980–81 Trade Cas. (CCH) ¶ 63,743 (10th Cir. January 20, 1981). And, *McLain*, as so interpreted, has the practical virtue of allowing plaintiffs to proceed against those local price fixing agreements (and similar restraints of trade) that are most likely to affect interstate commerce without imposing, under jurisdictional guise, a "proof of effects" test that, in a turbulent, ever-changing economy, may be difficult, or impossible, to meet.[37]

■ Despite the liberality of this test, plaintiffs have failed to meet it here. When challenged by defendants' motion to dismiss, plaintiffs responded by pointing to the deposition of plaintiff Ramon Cordova Oliver, brokerage president, and two documents, which, they claimed, showed that defendants reinsured their "single interest" policies outside Puerto Rico. They made no offer of other, specific pieces of evidence. The district court found that these pieces of evidence did not show that any such reinsurance existed in this case. That finding is reasonable. The two documents consisted of a sample policy and a list of policies

---

**36.** To hold the contrary in a price-fixing case, such as *McLain*, would undo years of jurisprudence making clear that a plaintiff need only prove a price-fixing agreement, not the agreement's effects, in order to prevail. The cases cited by the Court, *American Tobacco* and *Socony-Vacuum*, make clear that the Court had just this problem in mind.

**37.** *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); 2 Areeda and Turner, *Antitrust Law* ¶ 314 (1978).

written by the firm (with coded numbers). They do not, on their face, describe reinsurance. Though plaintiffs were adequately informed of the need for evidence and were close to trial, they offered nothing else.[38]

Nor can it be claimed that the type of antitrust violation charged by the plaintiffs is, in the context of the "single-interest" insurance business, likely to have an impact upon interstate commerce as a matter of "practical economics". As the pre-trial order makes clear, plaintiffs do not allege price fixing. Neither do they charge a classical boycott:[39] They do not allege an agreement *among competitors* not to deal with a third party; rather, they claim an agreement among persons within a single chain of product supply, each of whom buys from, or sells to, one of the others. To be more specific, the agreement is between a customer for insurance, a financer/beneficiary of the policy, a broker, and an insurance company. If these claims assert any form of antitrust violation at all—and we do not say that they do—it must be some form of unlawfully exclusive supply arrangement (an agreement to patronize Benitez "exclusively" which plaintiffs would seek to prove unreasonable) or conceivably some form of unlawful "tie" ("Chase would supply the dealers with financing only if they agreed to buy insurance from Benitez"). Unlike price fixing, which directly affects price and output, the injury to competition worked by these types of agreements, if unlawful, would consist of making it more difficult for firms to enter the business of brokering "single interest" insurance policies. On the state of the record here, there is simply no reason to believe, in logic or practical economics, that any such injury could have more than an insubstantial effect upon interstate commerce.

The judgment of the district court is

*Affirmed.*

---

**38.** The brokerage president stated in a deposition that many firms engage in reinsurance; but his deposition does not show that defendants did so in this case.

**39.** Whether these allegations fit within the boycott exception of the McCarran-Ferguson Insurance Regulation Act, 15 U.S.C. § 1013(b), was neither briefed nor argued.