The LOAN STORE, INC., Plaintiff,

v.

INDEPENDENT FOOD STAMPS ASSOCIATES, INC., et al., Defendants.

Civ. A. No. 87–1660–MA.

United States District Court, D. Massachusetts.

Oct. 5, 1987.

Stephen W. Silverman, Springfield, Mass., for plaintiff.

Donald B. Gould and Mark W. Pearlstein, Goodwin, Procter & Hoar, Boston, Mass., for Independent Food Stamps Associates and Bradlees, Inc.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

Plaintiff in this action, The Loan Store, Inc. ("Loan Store"), a Massachusetts corporation, brought this civil action on June 27, 1987 against the defendants Independent Food Stamps Associates, Inc. ("Independent"), Saratoga Drug, Inc. ("Saratoga"), both Massachusetts corporations, Bradlees, Inc. ("Bradlees"), a Connecticut corporation registered as a foreign corporation in the Commonwealth, and other, unnamed corporations, alleging violations of the federal antitrust laws, 15 U.S.C. §§ 1 and 2 (the Sherman Antitrust Act §§ 1 and 2) as well as violations of state law, seeking treble damages, costs, attorney's fees and injunctive relief. Jurisdiction is premised on 15 U.S.C. §§ 15 and 26 (the Clayton Antitrust Act §§ 4 and 16), 28 U.S.C. §§ 1331 and 1337, as well as on the doctrine of pendent jurisdiction.

The defendants have moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). That motion is presently before the Court.

According to the allegations made by Loan Store,[1] it appears that sometime in early September, 1986, Loan Store began negotiating with the Massachusetts Executive Office of Human Services, Department of Public Welfare ("DPW"), the state agency responsible for implementing the United States Department of Agriculture's ("USDA") Food Stamp Program, to become a food stamp distributor. After bringing itself into compliance with DPW guidelines and requirements, Loan Store and DPW reached an agreement on November 3, 1986,[2] and executed a contract and approved a draft of a letter whereby Loan

---

1. In a 12(b)(1) case, all uncontroverted factual allegations in the complaint are taken as true. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Needham v. Bohlen,* 386 F.Supp. 741, 744 (D.Mass. 1974).

2. Although the complaint suggested that the agreement between Loan Store and DPW remained an executory one on November 3, 1986, later submissions by the Plaintiff indicate that a contractual agreement was reached between the two on that date. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss,

Store would act as a food stamp issuing agent for a six-month trial period commencing in January, 1987. In early December, 1986, DPW cancelled the agreement in response to pressure brought to bear on DPW by the defendants. As the defendants' pleadings indicate, Independent acts as DPW's agent in distributing food stamps in Hampden County. Independent, however, does not distribute food stamps itself; instead, it contracts with subagents, providing them with food stamps for distribution. Bradlees and Saratoga are two such subagents. According to Loan Store's allegations, Independent, Saratoga, Bradlees and other, unnamed entities represented by Independent and involved in the distribution of food stamps represent a "dominant, substantial and significant share of the market for food stamp distribution" in Hampden County and Greater Springfield. Complaint, par. 13. Loan Store alleges that DPW repudiated its contract with Loan Store because the defendants threatened to cease distributing food stamps in Hampden County and Greater Springfield if Loan Store was authorized to act as an issuing agent. It is this purported action that Loan Store alleges constitutes a conspiracy or combination to restrain trade and establish a monopoly in the distribution of food stamps, implicating interstate commerce and thus triggering liability under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Loan Store also alleges that the defendants' actions constitute tortious interference with Loan Store's advantageous business and contractual relationship with DPW.

Section 1 of the Sherman Act states that Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal.

Section 2 declares that

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a misdemeanor ...

Common to both of these statutory provisions is the jurisdictional finding of an impact on the trade or commerce "among the several States" premised on and coextensive with the interstate commerce clause, Article I, Section 8 of the Constitution. *See United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944) ("That Congress wanted to go to the utmost extent of its constitutional power in restraining trust and monopolistic agreements ... admits of little, if any, doubt") (footnote omitted); *see also* American Law Institute, *Antitrust Developments* (Second) at 24 (1984) ("The reach of the Sherman Act is coextensive with the constitutional power of Congress under the commerce clause") (citations omitted). Over the years since the passage of the antitrust laws, two separate tests have developed to determine whether interstate commerce is sufficiently implicated to trigger liability under the antitrust laws, and simultaneously, jurisdiction in federal court. The first is known as the "flow of commerce" test, "which involves activities within the flow of interstate commerce;" the second is the "affecting commerce" test, "which involves activities that, even though themselves wholly intrastate, nevertheless substantially affect the flow of interstate commerce." 1 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* Section 4.03[1] (1986) (footnotes omitted). Loan Store premises its argument on the second prong,[3] asserting that although occurring solely within the bounds of the Commonwealth, the actions of the defendants nevertheless affect interstate commerce to such an extent as to permit federal cognizance of the action.

---

p. 2. As this was not raised by the parties as an issue, this latter interpretation will be accepted by the Court.

**3.** Loan Store does not make an argument based on the first prong, the flow of commerce test, although it does cite *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), *reh'g denied*, 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975), a case concerned with the flow of commerce paradigm, in its pleadings.

On July 24, 1987, the defendants collectively moved to dismiss the action under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that the activities complained of by the plaintiff were wholly intrastate and did not implicate interstate commerce so as to confer upon this court jurisdiction to hear the antitrust complaint. Loan Store filed its opposition to defendants' motion to dismiss on August 10, 1987.

■ The Court's resolution of the subject matter jurisdiction issue thus turns on the extent to which defendants' admittedly intrastate activities can be said to affect interstate commerce. To establish jurisdiction under the effects test, the alleged conduct of a putative antitrust defendant must have a "substantial and adverse" affect on interstate commerce, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 743, 96 S.Ct. 1848, 1851–52, 48 L.Ed.2d 338 (1976), "or what is apparently the same thing, a 'not insubstantial effect' " on interstate commerce. *Cardio-Medical Associates, Ltd. v. Crozier-Chester Medical Center*, 721 F.2d 68, 71 (3rd Cir.1983), *quoting McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1979). This is not a rigorous test. As the Supreme Court indicated in *McLain*, an antitrust complaint should not be dismissed on jurisdictional grounds unless " 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id., quoting Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *See also Hospital Building*, 425 U.S. at 746, 96 S.Ct. at 1853 ("And in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (citation omitted). Despite the liberality of the test for jurisdiction, and because of the reasons which follow, I nevertheless find that the defendants' actions, as alleged by Loan Store, do not have the requisite effect to bring this action under the aegis of the federal antitrust laws, and therefore I grant the motion to dismiss.

In its complaint, Loan Store asserts that sometime in November or early December, 1986, the defendants, by threatening to boycott the distribution network in the western part of the Commonwealth in which they played a large role, jointly pressured DPW to break its agreement with Loan Store to act as a food stamp distributing agent for a brief trial period. Complaint, par. 12 and 13. Based on this information, it would thus appear that Loan Store's allegations may satisfy the requirement that a combination be shown to restrain trade or to monopolize a market in violation of sections 1 and 2 of the Sherman Act. *See, e.g., Corey v. Cook*, 641 F.2d 32, 36 & n. 4 (1st Cir.1981) (finding that the district court erred in dismissing an antitrust complaint where "a single competitor conspired with individuals at an adjacent level of economic activity to sever [plaintiff's] essential lines of supply"). Nevertheless, the antitrust laws do not and cannot apply to *all* such combinations. As noted above, the requirement that the alleged acts of the defendants affect interstate commerce may not be a rigorous one, yet, it *is* of constitutional dimension; for a federal court to constitutionally act in such cases, interstate commerce must be implicated in some substantial way. That has not been demonstrated here.

The showing necessary to establish the proper effect on interstate commerce was explored by the Supreme Court in *McLain* and by the First Circuit in *Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank*, 649 F.2d 36 (1st Cir.1981), a case interpreting *McLain*. In *McLain*, the Court noted that the antitrust plaintiff must identify the link between interstate and intrastate activity, but need not spell it out in detail; plaintiffs need only demonstrate a *substantial effect* on interstate commerce, and not "the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy." 444 U.S. at 242, 100 S.Ct. at 509.[4]

**4.** Requiring the latter showing would allow a

defeat of jurisdiction with "a demonstration that

In *Cordova*, the First Circuit elaborated on *McLain*. In his opinion for the court, Judge Breyer noted that the *McLain* formulation does not require that a plaintiff prove that the defendant's acts allegedly in violation of the antitrust laws *actually* affect interstate commerce; it only requires that

> defendant's business ... be so connected with interstate commerce that it is *logical, as a matter of practical economics,* to believe that the unlawful activity will affect interstate commerce ... *McLain,* as so interpreted, has the practical virtue of allowing plaintiffs to proceed against those local price fixing agreements (and similar restraints of trade) that are most likely to affect interstate commerce without imposing, under a jurisdictional guise, a "proof of effects" test that, in a turbulent, ever-changing economy, may be difficult, or impossible, to meet.

*Cordova,* 649 F.2d at 45 (emphasis supplied) (footnote omitted).

In order to establish the necessary practical, logical connection between the alleged agreement in this case and interstate commerce, Loan Store cites the regulations governing the food stamp program as promulgated by the Commonwealth of Massachusetts, which indicate that USDA administers and supervises the food stamp program, and also provides funding and supplies. *See* 106 C.M.R. 360.000, *et seq.,* "Food Stamp Program: General Provisions"; Massachusetts Food Stamp Vendor Issuance Handbook, Part 100 *et seq.* (DPW, April, 1983). Plaintiff also argues that interstate commerce is implicated because the goods purchased with food stamps have traveled in interstate commerce.[5]

The complaint, however, only states that defendants' actions have prevented Loan Store from becoming a distributor of food stamps. It does not allege that the flow of food stamps will be affected. On the contrary, the supply of food stamps is undoubtedly independent of the network established to distribute it; the addition of one or more distributors by a *state* agency surely would not result in the authorization from the *federal* government to distribute more food stamps. In short, the fact that Loan Store has been denied the right to distribute food stamps will not have *any* appreciable effect on the number of food stamps issued and the amount of food purchased with them. Unlike the case whereby a private sector distributor is blocked out of a market, this case presents a situation in which a *fixed* number of goods (food stamps) is being issued to a *fixed* class of recipients. *Contrast, e.g., Hospital Building,* 425 U.S. at 744–46, 96 S.Ct. at 1852–53 (where the Court noted that the actions of the defendants, if successful, would result in decreased out-of-state purchases, decreased revenue to out-of-state entities, and would have other effects, all of which would "place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce"). Thus, in this rather unique situation, the impact on interstate commerce is limited to the actual economic harm, whatever that may be, to Loan Store itself.

Nor does the fact that USDA directs the food stamp program change the analysis here, despite *Zamiri v. William Beaumont Hospital,* 430 F.Supp. 875 (E.D.Mich. 1977), upon which plaintiff relies in support of its assertion that the alleged conspiracy here sufficiently affects interstate commerce. In that case, a doctor sued the defendant hospital, claiming that his exclu-

---

the alleged restraint failed to have its intended anticompetitive effect." *McLain,* 444 U.S. at 243, 100 S.Ct. at 509.

**5.** Loan Store also alleges that interstate commerce is implicated because "a purpose of the food stamp program is to improve nutrition among low level households and combat hunger and malnutrition thereby improving health, which among the poor is often paid for by federal funds, via medicaid." Plaintiff's Opposition to Defendants' Motion to Dismiss, at 1.

Loan Store adds that food stamp recipients often receive other forms of federal assistance, "such as SSI, which further weakens Defendants' argument that their activity is local and has no effect on interstate commerce." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, at 6. I find these purported connections to interstate commerce to be far too speculative and attenuated to be worthy of serious discussion.

sion from the facility by the hospital and staff doctors constituted a combination and conspiracy in restraint of trade and interstate commerce because "many of his patients receive federal medicare or medicaid assistance ... [and] his consequent loss of federal medicare and medicaid customers ... constitutes an effect on his participation in interstate commerce." *Id.* at 876. The court rejected defendants motion to dismiss under Rules 12(b)(1) and 12(b)(6), noting that

> in this case local medical service payments are part of the interstate receipt of benefits from federal agencies in the District of Columbia.

*Id.* at 877.[6] However, the teaching of the *Zamiri* case and others like it[7] is inapposite here. According to the affidavit of Albert J. Bonavita, president of Loan Store, reimbursement for issuing food stamps comes from *DPW, not* from the federal government. Affidavit of Albert J. Bonavita, par. 5, at 3 ("The issuing agent would ... return the [food stamp] vouchers to the DPW and receive a small fee from the Department."). Thus, any potential argument by Loan Store that the alleged boycott had a direct effect on itself and thus

---

**6.** Two other cases were mentioned in the *Zamiri* opinion and cited by plaintiff Loan Store. In *Alabama Optometric Association v. Alabama State Board of Health,* 379 F.Supp. 1332, 1335 (M.D.Ala.1974), the parties agreed that an alleged conspiracy to deprive the members of the plaintiff organization of their right to provide and participate in medical benefits available under Medicaid affected interstate commerce such that the suit was not subject to a motion to dismiss, the court holding that "evidence must be elicited before a determination as to the sufficiency of the allegations can be made." As the discussion of the instant case below indicates, no new evidence need be presented for this Court to rule on the motion to dismiss here. In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), *reh'g denied,* 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975), Virginia residents sued members of the Virginia bar alleging that the use of a minimum fee schedule in paying attorneys for conducting title searches in real estate transactions constituted price fixing in violation of the Sherman Act. There the Court held that although the real estate transactions and the title searches themselves were entirely local activities, the fact that a "significant portion" of the funds used to buy the houses came from out-of-state sources, including the Veterans Administration and the Department of Housing and Urban Affairs in Washington, and that these funds represented a "substantial volume of commerce," the court concluded that because of the "inseparability of ... [the] legal service from the interstate aspects of [the] real estate transactions ... interstate commerce has been sufficiently affected." *Id.* at 785, 95 S.Ct. at 2012 (citations omitted) (footnotes omitted). The key element in that case, then, was the close connection between the intrastate activity (title searches) and the overall *flow* of interstate commerce (such as loan money or purchase money coming from out of state), a situation that does not exist here. *See* n. 3, *supra* at 4.

**7.** Several cases have noted that the movement of federal money across state lines may be a significant factor in determining if interstate commerce is sufficiently affected to justify federal court action in an antitrust case. *See, e.g., McLain,* 444 U.S. at 237, 100 S.Ct. at 506–07 (noting that one of the factors that lead the court to accept jurisdiction was that "[m]ultistate lending institutions took mortgages insured under federal programs which entailed interstate transfers of premiums and settlements," also indicating that the federal government had insured loans worth millions of dollars, *id.* at 237, 100 S.Ct. at 506–07); *Marrese v. Interqual, Inc.,* 748 F.2d 373, 383 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985) (affirming dismissal of antitrust claim brought by doctor against hospital and others, but noting that the complaint alleging, *inter alia,* that the doctor derived revenue from Medicaid and Medicare satisfied jurisdictional prerequisites); *DeGregorio v. Segal,* 443 F.Supp. 1257, 1267 (E.D.Pa.1978) (rejecting defendant's 12(b)(1) motion, one factor being the receipt of Medicaid payments by defendants); *United States v. American Society of Anesthesiologists,* 473 F.Supp. 147, 151 & 156 (S.D.N.Y.1979) (indicating that, in analyzing the impact of guides used to establish fees for anesthetic services, the fact that the level of fees would impact on Medicare and Medicaid programs was significant in determining the involvement of interstate commerce); *but see Doe on behalf of Doe v. St. Joseph's Hospital,* 788 F.2d 411, 417 (7th. Cir.1986) (holding that a physician's receipt of money from governmental insurance programs, among other factors, was not enough to implicate interstate commerce); *Miller v. Indiana Hospital,* 562 F.Supp. 1259, 1285–6 (W.D.Pa. 1983) (ruling that despite allegations that a hospital received "35% of [its] annual income ... from Medicare", that "Medicaid funds allegedly represent 6.5% of the Hospital's annual income", and that "[t]he Hospital has also received federal grants in aid totalling $2,200,-000.00," the complaint failed to demonstrate that interstate commerce was sufficiently involved to establish jurisdiction).

should be enough to implicate interstate commerce is greatly weakened since reimbursement from the federal government, which would involve federal money crossing state lines, does not flow directly, if at all, to Loan Store. Any connection to interstate commerce in this manner is thus attenuated at best. It does not amount to a substantial involvement with interstate commerce necessary to trigger federal jurisdiction. Indeed, were that all that is required to trigger federal cognizance of an antitrust action under federal law, the federal courts would be inundated with similar such complaints premised on perhaps more tenuous connections to the sprawling, seemingly omnipresent federal bureaucracy.

Loan Store also asserts that because food stamps are used to purchase foodstuffs that have moved, at some point, in interstate commerce, the actions of the defendants should thus be seen as impacting on interstate commerce. I am unpersuaded by this argument. Although it may be true that some goods purchased with food stamps have crossed state lines, plaintiff's reliance on this point is misplaced. On a very practical level, the acceptance by this Court of this very attenuated connection between the defendants' intrastate actions and interstate commerce in foodstuffs appears to be an unwise step toward further blurring of the already strained distinction between intra- and interstate activity. At some point, as the governing law in this area illustrates, such an interconnection must rightly be seen as incidental, lest the concept of interstate commerce be expanded to such an extent as to become virtually meaningless.

Nor would the purposes motivating the Sherman Act be furthered with an assertion of federal jurisdiction in this matter. As the First Circuit indicated in *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 8 n. 4 (1st Cir.1977), *aff'd*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), concerted refusals to deal "may restrain traders' 'ability to sell in accordance with their own judgment,' they can deprive consumers of the 'freedom to buy ... in an open competitive market', and they 'interfere with the natural flow of intestate commerce.' " (citations omitted).[8] The actions of the defendants in preventing Loan Store from becoming a distributor do not implicate the goals of preserving the free flow of the marketplace to any great extent. To be sure, they have restricted *Loan Store's* participation in a portion of that market, but beyond this immediate impact, the effect of defendants' actions are only indirect and insubstantial. It is clearly not the type of case envisioned by the drafters of the Sherman and Clayton Acts, who provided the stern sanction of treble damages and attorney's fees to deter those actions that threaten the integrity of the national marketplace. "The jurisdictional reach of the Sherman Act, although expansive, is not without limit." *Hayden v. Bracy*, 744 F.2d 1338, 1343 (8th Cir.1984). The relationship to interstate commerce adverted to by the plaintiff simply does not suggest the substantial effect, as a matter of practical economics, on the flow of goods and services between the states demanded by the jurisdictional prerequisites of the Sherman Act. In short, Loan Store's complaint fits squarely within the proposition that where "the restraint *indirectly* affects interstate commerce and its effect on commerce is *insubstantial*, there is no showing of the jurisdiction element of interstate commerce under Section 1." 1 J. Von Kalinowski, *Antitrust Laws* at 4.03[4] (footnote omitted). This is not to say that Loan Store has suffered no legally cognizable injury. It is to say, however, that if Loan Store has suffered such injury, it is not remediable under the antitrust laws.

For the reasons discussed above, the motion to dismiss the antitrust claim is al-

---

**8.** The *Barry* case is apt here because the instant case is one involving a conspiracy among entities at one end of a supply line, the distributive end. The situation here, then, does not involve a situation like that in *Cordova*, where one link in a chain of supply was excised. 649 F.2d at

46. Thus, the language in *Cordova* relied on by the defendants on this point is inapposite. Memorandum in Support of Defendants' Motion to Dismiss at 6; Reply Brief in Support of Defendants' Motion to Dismiss at 3–4.

lowed. The remaining claim, premised solely on state law and presented to this Court under its pendent jurisdiction, can be brought in the state court as the action is within the applicable statute of limitations. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (noting that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); *McLaughlin v. Campbell*, 410 F.Supp. 1321, 1326 (D.Mass.1976) (dismissing the state claims but observing that "in fairness to plaintiff it should be first established that these claims are not barred by the state statute of limitations. If this action were so barred, the Court would be inclined to reconsider its decision today"). That claim is thus dismissed without prejudice.

SO ORDERED.