# United States Court of Appeals
## For the First Circuit

Nos. 18-1189, 18-1395; 18-1258

UNITED STATES OF AMERICA,

Appellee,

v.

LUCIANO VEGA-MARTÍNEZ, aka Lucio; RENÉ GARAY-RODRÍGUEZ, aka Gary,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

Before

Torruella, Thompson, Kayatta,
Circuit Judges.

Ignacio Fernández de Lahongrais on brief for appellant Vega-Martínez.
Julie Sonderlund for appellant Garay-Rodríguez.
Steven J. Mintz, Attorney, U.S. Department of Justice, Antitrust Division, with whom Makan Delrahim, Assistant Attorney General, Andrew C. Finch, Principal Deputy Assistant Attorney General, Richard A. Powers, Deputy Assistant Attorney General, Michael F. Murray, Deputy Assistant Attorney General, Stratton C. Strand, Attorney, Antitrust Division, Robert B. Nicholson, Attorney, Antitrust Division, Mark C. Grundvig, Attorney, Antitrust Division, Emma M. Burnham, Attorney, Antitrust Division, and Samson Asiyanbi, Attorney, Antitrust Division, were on brief, for appellee.

January 31, 2020

**KAYATTA**, <u>Circuit Judge</u>.  The two appellants in this case are school-bus operators who contracted with the Caguas, Puerto Rico municipal school system to drive school children to and from school each day.  Instead of competing with one another in bidding on routes offered by the municipality in 2013, they gathered together with four other school-bus operators in an old-fashioned bid-rigging and market-allocation conspiracy.  In brief, they all agreed on which company would submit the lowest bid on each route, thereby protecting themselves from the price-reducing effects of fair competition.  Following trial, conviction, and sentencing on charges of mail fraud and violations of section 1 of the Sherman Act, Luciano Vega-Martínez and René Garay-Rodríguez now appeal, claiming an absence of interstate nexus, insufficiency of the evidence, and assorted other issues. For the following reasons, we affirm.

## I.

In 2013, Vega-Martínez, Garay-Rodríguez, and their co-defendants owned competing bus companies that sought to provide busing for low-income students from Caguas to public schools in the area.  That year, the municipality announced that it would hold an auction for four-year school-bus-transportation contracts. Rather than submitting competing bids, the conspirators met and agreed to divide up the routes among themselves.  For each route, a "winner" was pre-designated, and that "winner" was assured that,

at most, only one other bidder would bid on the route (to make it look like there was competition).  The other bid, if any, would be a high bid (to allow plenty of room for the winner's non-competitive "low" bid).

After the meeting, bids were submitted.  The municipality rejected all of the bids and instead negotiated contracts with each of the low bidders without the benefit of knowing that the low bids were undisciplined by fair competition.  The municipality then sent award letters to the successful defendants in the mail.  Over a year later, news of the bid rigging leaked.  Worse yet for the defendants, it turned out that one of the bus-company owners, Raquel Aldea-Rodríguez, had taped the meeting at which the scheme was put together.  In May 2015, the defendants were charged in an indictment alleging conspiracy to restrain trade (15 U.S.C. § 1), conspiracy to commit mail fraud (18 U.S.C. § 1349), and substantive mail fraud counts (18 U.S.C. § 1341).  After a seven-day trial, all of the defendants were convicted on all of the charged counts.  The defendants made Rule 29 motions, which were all denied.  They were each sentenced to a prison term of one year and one day, plus a year of supervised release.

The district court then allowed the parties to separately brief the issue of restitution. To calculate the amount of restitution due from each defendant, the court ultimately

- 4 -

compared the price paid for each route under the 2014 contracts with the prices paid for the same routes in 2017 following a competitive auction in 2016. Defendants Garay-Rodríguez and Vega-Martínez now appeal. Garay-Rodríguez challenges several aspects of his conviction, and both challenge the restitution amounts set by the district court.

## II.

### A.

The Sherman Act reaches only activities in the flow of interstate commerce or that, "while wholly local in nature," would substantially affect interstate commerce if successful. McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 241–42 (1980); see also Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330–32 (1991). When confronted with horizontal agreements to fix prices within a single state, the Supreme Court has based jurisdiction "on a general conclusion that the defendants' agreement 'almost surely' had a market[-]wide impact and therefore an effect on interstate commerce." Summit Health, 500 U.S. at 331 (quoting Burke v. Ford, 389 U.S. 320, 322 (1967)); see also Goldfarb v. Va. State Bar, 421 U.S. 773, 784–85 (1975) (finding an effect on interstate commerce where the "volume of commerce involved" was "substantial" and it was "inseparab[le] . . . from the interstate aspects of [related] transactions").

Garay-Rodríguez nevertheless contends that his bid rigging was beyond the reach of the Sherman Act for three reasons: either the indictment failed to allege a sufficient nexus to interstate commerce, or the proof fell short, or the jury was not instructed that it was required to find such a nexus. For the following reasons, we find that the indictment alleged that the defendants' conduct flowed in and had an effect on interstate commerce, that the evidence at trial supported those allegations, and that there was no plain error in the jury instructions.

**1.**

Before trial, Garay-Rodríguez and his co-defendants moved to dismiss the Sherman Act count for failure to allege a nexus between the scheme and interstate commerce.[1] The district court denied the motion. We review de novo the sufficiency of an indictment. United States v. Stepanets, 879 F.3d 367, 369 (1st Cir. 2018); United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011). In so doing, we do not evaluate the sufficiency of the evidence that the government might have to back up the indictment. Guerrier, 669 F.3d at 4-5. Rather, we will find an indictment sufficient if it "apprise[s] the defendant of the charged offense so that the defendant can prepare a defense and plead double

---

[1] They also argued that Puerto Rico was not a state for purposes of the Sherman Act, but the district court roundly rejected that argument, and it is not raised on appeal.

jeopardy in any future prosecution for the same offense." United States v. Rodríguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019) (internal citations omitted) (quoting Stepanets, 879 F.3d at 372); see also Fed. R. Crim. P. 7(c)(1) ("The indictment or the information must be a plain, concise and definite written statement of the essential facts constituting the offense charged."). It may "parrot 'the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged.'" United States v. Parigian, 824 F.3d 5, 9 (1st Cir. 2016) (quoting United States v. Savarese, 686 F.3d 1, 6 (1st Cir. 2012)).

Here, the indictment did more than was necessary. It plainly set forth the elements of the charged offenses, including that the defendants' activities "were within the flow of, and substantially affected, interstate trade and commerce." It further alleged that the bus contracts were funded or supported at least in part by federal funds, and that the buses used by the defendants had all been shipped via interstate commerce. Whether the evidence was sufficient to back up these assertions was a matter for trial. See Rodríguez-Rivera, 918 F.3d at 34; Guerrier, 669 F.3d at 4-5.

**2.**

At trial, the government's burden increased. It had to submit evidence sufficient to establish an interstate nexus beyond a reasonable doubt. Cf. United States v. DiSanto, 86 F.3d 1238, 1246 (1st Cir. 1996) (requiring interstate-commerce element to be proven beyond a reasonable doubt in the context of a Commerce Clause challenge). The government carried this burden. It proved, for example, that the funds used to pay the defendants were provided by the federal government under the No Child Left Behind Act. Raymond Rivera-Pacheco, a CPA hired by the Puerto Rico Department of Education, testified that Caguas used $436,566.32 in federal funds from the No Child Left Behind Act to pay for school transportation in 2013–2014. The conspiracy's grab of those federal funds is likely sufficient by itself to establish an interstate nexus, given that the funds flowed in interstate commerce. See Goldfarb, 421 U.S. at 783–84 (deeming intrastate price fixing by lawyers for title work on federally guaranteed real estate purchases to have an interstate nexus); Englert v. City of McKeesport, 736 F.2d 96, 98 n.4 (3d Cir. 1984) (federal financing of construction projects "would be sufficient to meet the jurisdictional requirement" of the Sherman Act); United States v. Davis, 707 F.2d 880, 884 (6th Cir. 1983) (federal funding of sheriff's office was sufficient to put sheriff's alleged racketeering within the flow of interstate commerce in Hobbs Act

- 8 -

context); United States v. Am. Soc'y of Anesthesiologists, Inc., 473 F. Supp. 147, 151, 156–57 (S.D.N.Y. 1979) (insurance payments, including some federal and state funds, flowed in interstate commerce); DeGregorio v. Segal, 443 F. Supp. 1257, 1267 (E.D. Pa. 1978) (federal nursing home reimbursements flowed in interstate commerce via the state of Pennsylvania's Medicaid program). But see Loan Store, Inc. v. Indep. Food Stamps Assocs., Inc., 671 F. Supp. 844, 848, 848 n.5 (D. Mass. 1987) (federal funding of the food-stamp program was "far too speculative" a basis for Sherman Act jurisdiction where the complaint "d[id] not allege [an effect on] the flow of food stamps").

Here we have more than the federal funds alone. The defendants' bid packages identified by vin number the specific buses that they planned to use for each route. Those buses were all purchased in Florida, meaning that they flowed in interstate commerce. As the government points out, if prices increased substantially, demand would likely fall. For example, Caguas might have responded by merging bus routes or reducing the bus services it used in other ways, resulting in fewer buses purchased by local companies from the continental United States. Cf. Katzenbach v. McClung, 379 U.S. 294, 299 (1964) (explaining that race discrimination at restaurants would reduce those restaurants' demand for food stuffs from outside the state: "The fewer

- 9 -

customers a restaurant enjoys the less food it sells and consequently the less it buys.").

Given the evidence that the contracts were funded in at least substantial part by federal funding that had flowed through interstate commerce and that the contracts were carried out by use of goods that flowed through interstate commerce, as well as the resulting inference that the effect of the conspiracy could have been to reduce demand for those goods, the evidence in total was sufficient to establish a nexus with interstate commerce.

**3.**

Next, Garay-Rodríguez argues for the first time on appeal that the district court's instructions to the jury on interstate commerce were incorrect. While we ordinarily review the legal correctness of jury instructions de novo, and issues of "phrasing and emphasis" for abuse of discretion, United States v. Allen, 670 F.3d 12, 15 (1st Cir. 2012), we review forfeited challenges like this one only for plain error, see Ramírez-Burgos v. United States, 313 F.3d 23, 28 (1st Cir. 2002).

Garay-Rodríguez argues that the district court failed to fully explain the requirement that an effect on interstate commerce be "substantial." The district court explained that

> A conspiracy may have an effect on interstate commerce even though some or all of the conspirators do not themselves engage in interstate commerce and have confined their activities within a single state. The precise

- 10 -

amount, quantity, or value of interstate commerce involved is unimportant so long as you find that the restraint charged in the indictment or the activities of the parties to the conspiracy had some <u>non-substantial</u> effect upon interstate commerce. The government may establish that there was an effect on interstate commerce in many different ways, and you should take into account all the evidence in determining whether there was, in fact, a <u>substantial effect</u> on interstate commerce.

Trial Tr., Dkt. 235 at 184:3–16, <u>United States</u> v. <u>Rivera-Herrera et al.</u>, No. 15-cr-00361 (D.P.R. Feb. 1, 2017) (emphasis added). The district court's statement that the conspiracy needed to have "some non-substantial effect" was obviously incorrect, despite government counsel's sketchy attempt to rewrite the record in its briefing on appeal. <u>See</u> Gov. Br., Appellate Dkt. 60 at 41–42 (quoting the district court as stating that "some no[t][in]substantial effect" was required (alterations in original)). While it does seem likely to us that the court meant to cite the Supreme Court's statement in <u>McLain</u> that the effect need only be "not <u>in</u>substantial," the district court plainly stated the opposite. <u>McLain</u>, 444 U.S. at 246 (emphasis added). Nevertheless, in the very same instruction, and at several other points, the district court repeatedly explained that the effect needed to be substantial. Likely for the same reason that no defense counsel objected to the instruction contemporaneously, a reasonable jury would not have been confused by the district court's isolated and

- 11 -

likely apparent mistake considering its numerous correct explanations. On plain-error review, we find no sufficient showing of prejudice.

Garay-Rodríguez also argues that the court should have reiterated the "substantial effect" requirement throughout its jury instructions on interstate commerce. But the court was clear enough. A substantial effect is only one possible way to show a nexus with interstate commerce; activity occurring in the flow of interstate commerce is another. See Summit Health, 500 U.S. at 337 (citing Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 (1959)). The court explained both theories, and when it explained the "substantial effect" test it was always clear that the effect needed to be substantial (with the exception of the slight mistake discussed above); it was not required to repeat the word "substantial" in every single instruction -- especially not in instructions explaining the "flow" theory. Garay-Rodríguez has thus failed to show plain error on the interstate-commerce instructions.

**B.**

Garay-Rodríguez next argues that the government and the district court allowed him and his co-defendants to be convicted for price fixing even though the charges they faced were for bid rigging and market allocation only. He argues both that this was a prejudicial variance from and that it was a constructive

amendment to the indictment.  We review these claims de novo.  See United States v. Godfrey, 787 F.3d 72, 78 (1st Cir. 2015).  "A constructive amendment 'occurs where the crime charged has been altered, either literally or in effect, after the grand jury last passed upon it.'"  Id. at 79 (quoting United States v. Mubayyid, 658 F.3d 35, 49 (1st Cir. 2011)).  A variance -- or a change in a charge that "le[aves] the substance of the charge unaffected" -- is permitted unless "it affect[s] the defendant's 'substantial rights[,]' . . . i.e., the right[] to have . . . knowledge of the charge [sufficient] to prepare an effective defense and avoid surprise at trial, and [the right] to prevent a second prosecution for the same offense." Id. (first alteration in original) (quoting United States v. Dowdell, 595 F.3d 50, 67–68 (1st Cir. 2010); United States v. Fisher, 3 F.3d 456, 463 (1st Cir. 1993)).

The crux of these claims is Garay-Rodríguez's argument that the government submitted evidence of price fixing even though the indictment referred to "bid-rigging" and did not expressly allege price fixing.  But the fact that price fixing might be mentioned in a bid-rigging case strikes us as perfectly appropriate.  Most bid-rigging schemes will necessarily include discussions of price.  Here, for example, the scheme involved explicitly deciding which companies would submit the high and low bids on each route.  To disallow evidence of those conversations would be nonsensical and would prevent the government from making

its bid-rigging case. That evidence was probative of bid rigging, and it was clearly set out in the indictment. See United States v. Reeder, 170 F.3d 93, 105 (1st Cir. 1999). Moreover, bid rigging of the type at issue here is simply one pernicious form of price fixing. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2005b (3d ed. 2012) ("Bid-rigging schemes are commonly thought to be more harmful than ordinary price fixing because bid-rigging is much easier for cartel members to enforce."). And even if that were not the case, the district court was clear with the jury that it could not convict on bid rigging based solely on evidence of price fixing alone. Despite Garay-Rodríguez's claim, then, a reasonable jury would not have believed that it could convict on evidence of price fixing without more. There was no variance from or constructive amendment to the indictment.

## C.

Next, Garay-Rodríguez argues that the district court erred in not allowing him to present evidence on the price negotiations that took place between the "low" bidders and the municipality after the auction. Specifically, he points to limitations imposed on his cross-examination of Luz Ortíz-Peña, the auxiliary director of the Caguas Purchasing and Auctions Department. Before trial, the district court granted the government's motion in limine to exclude evidence or arguments

that the defendants' "agreements to rig bids and allocate the market for public school bus transportation were reasonable, or that such agreements had economic, business, or personal justifications." During Garay-Rodríguez's cross-examination of Ortíz-Peña, Garay-Rodríguez asked multiple questions about the process of renegotiating the bids after the auction. His attorney finally asked whether Ortíz-Peña had told an FBI agent that in some cases it was more "cost-effective" to merge two routes. She answered, "That is correct," and when Garay-Rodríguez tried to follow up the court told him to "move on."

Essentially, Garay-Rodríguez is arguing that he should have been permitted to show that the final prices decided post-negotiation with the low bidders were not that bad, even reasonable. But Garay-Rodríguez and his co-defendants were charged with bid rigging and market allocation, both per se violations of the Sherman Act. See N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958) ("Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." (internal citations omitted)); Stop & Shop Supermkt. Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 62 (1st Cir. 2004) (explaining that horizontal bid rigging is a per se violation of antitrust laws). Determining the defendants' liability for that conduct did not require the jury to assess its

supposed reasonableness.  See United States v. Peake, 804 F.3d 81, 93 n.10 (1st Cir. 2015) ("A per se Section 1 violation is not excused by a showing that the supra-competitive prices were somehow still reasonable.").  Garay-Rodríguez did not proffer any other reason why the ultimate cost-effectiveness of the final route allocations was relevant.  So, it was well within the district court's discretion under Federal Rule of Evidence 403 to exclude evidence at trial about whether the defendants' conduct really cost Caguas much money.

**D.**

Garay-Rodríguez argues that the district court abused its discretion by admitting a summary chart depicting the total number and duration of calls and attempted calls between the defendants' telephone numbers daily during the two months within which they were alleged to have planned and implemented the bid rigging.  Garay-Rodríguez claims that the chart should have been excluded under Rule 403, which allows exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  We review this evidentiary decision for an abuse of discretion and "usually defer to the district court's balancing."  United States v. Whitney, 524

F.3d 134, 141 (1st Cir. 2008) (quoting United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002)).

There was nothing unfairly prejudicial about the chart. To be sure, it supported an inference that the defendants conspired. But that simply means that the evidence was probative. And to the extent defendants claim that the jurors might have thought the evidence to be more incriminating than that, any such risk was eliminated by the trial judge's instruction pointing out the chart's limitations in not showing who actually was on the calls or what they said.

**E.**

Garay-Rodríguez's next set of arguments revolves around the overlap between the mail fraud and Sherman Act counts. Garay-Rodríguez did not make these arguments below, so we review them for plain error. United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016).

First, Garay-Rodríguez seems to argue that the district court should have instructed the jury that it had to find a mail-fraud scheme that was separate and distinct from the Sherman Act conspiracy. That is incorrect. Assuming the jury found that the mail fraud was committed in the process of bid rigging or market allocation, it was free to find that the defendants' conduct both violated the Sherman Act and constituted mail fraud. Cf. United States v. Valdés-Ayala, 900 F.3d 20, 30-34 (1st Cir. 2018)

(upholding convictions of both bankruptcy fraud and wire fraud for the same underlying conduct).

Second, Garay-Rodríguez argues that there was not sufficient evidence to convict him for mail fraud. Sufficiency challenges like this one that are not preserved through a Rule 29 motion after trial are reviewed under "a particularly exacting variant of plain error review." United States v. Foley, 783 F.3d 7, 12–13 (1st Cir. 2015).

Here the government presented evidence to establish both elements of a mail-fraud conviction: that the defendant "devised or intend[ed] to devise a scheme to defraud (or to perform specified fraudulent acts), and . . . use of the mail for the purpose of executing, or attempting to execute, the fraud (or specified fraudulent acts)." Schmuck v. United States, 489 U.S. 705, 721 (1989). The government presented clear evidence of a scheme to defraud through the testimony of Aldea-Rodríguez and documentary evidence of the bids, including the defendants' certifications that their bids were "fair and free of collusion or fraud," a statement that the jury obviously decided was false. The government then showed that the scheme required a relevant and foreseeable use of the mail because the defendants received the object of the conspiracy -- their contract award letters -- by certified mail.

Proof of mail fraud does not require proof of an actual mailing by the specific defendant. United States v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008) (requiring only that the defendants "cause[d] the use of the mails, which includes reasonably foreseeable mailings" and "use[d] the mails for the purpose, or in furtherance, of executing the scheme to defraud" (emphasis omitted)). Garay-Rodríguez cites United States v. Berroa, 856 F.3d 141 (1st Cir. 2017), for a more restrictive view of the causation requirement. Id. at 148–52 (explaining that the defendants' submission of falsified test scores did not sufficiently cause the mailing of their resulting medical licenses, which were not a property interest of the governing board). Berroa does not control here, however, where the awarding of the contracts themselves was an alleged financial loss to the municipality and gain to the defendants. See id. at 152 (explaining that the defendants in Berroa did not profit from their fraud until "in the ensuing years after becoming licensed, [they] practiced medicine for profit"). The district court thus did not plainly err in allowing conviction on this evidence.

Finally, the same evidence described above also supports the defendants' convictions for conspiracy to commit mail fraud, which in addition to "intent to commit the substantive offense" requires "intent to agree" to do so -- whether or not the substantive offense is ultimately carried out. United States v.

Delgado Figueroa, 832 F.2d 691, 694-96 (1st Cir. 1987). Aldea-Rodríguez's testimony and tape recording of the meeting at which the conspiracy was hatched, as well as documentation of the defendants' phone calls and bid submissions, sufficiently supports a finding that the defendants agreed to submit fraudulent bids and cause the municipality to send out award letters based on that fraudulent information.

**F.**

The last set of challenges is to restitution amounts of $114,181 for Garay-Rodríguez and $93,055 for Vega-Martínez. The Mandatory Victims Restitution Act of 1996 ("MVRA") requires restitution for any "offense against property . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A. Restitution is "based on actual loss, not intended or expected loss," United States v. Innarelli, 524 F.3d 286, 295 (1st Cir. 2008); see also United States v. Fair, 699 F.3d 508, 513 (D.C. Cir. 2012) (explaining that the defendant's gain is not a substitute measure under the MVRA in most circuits), and it is the government's burden to establish the loss amount by a preponderance of the evidence, 18 U.S.C. § 3664(e); United States v. Prochner, 417 F.3d 54, 65 (1st Cir. 2005). In calculating the restitution award, "a sentencing court is not held to a standard of absolute precision." United States v. Salas-Fernández, 620 F.3d 45, 48 (1st Cir. 2010). Instead, "the restitutionary amount [need only]

have a rational basis in the record." Id. Legal conclusions underpinning restitution awards are reviewed de novo, factual findings for clear error, and orders of restitution on the whole for abuse of discretion. Innarelli, 524 F.3d at 293; Prochner, 417 F.3d at 65-66.

The district court based the restitution order on the difference between the prices that Caguas paid the defendants for their routes in 2014 after the rigged 2013 auction, and the amount that it paid for those same routes in 2017 after a presumably fair auction in 2016. The court then allocated the loss between the defendants based on their routes. Garay-Rodríguez was ordered to pay $114,181 and Vega-Martínez, $93,055.

## 1.

Garay-Rodríguez -- but not Vega-Martínez -- first challenges the restitution award under Apprendi v. New Jersey, 530 U.S. 466 (2000), arguing that the amount of restitution should have been found by the jury instead of by a judge. This challenge was not preserved, so we review it for plain error. Prieto, 812 F.3d at 17. This circuit has previously held, "like all of the other circuits to consider this question," that "Booker and its antecedents do not bar judges from finding the facts necessary to impose a restitution order." United State v. Milkiewicz, 470 F.3d 390, 403-04 (1st Cir. 2006). Garay-Rodríguez contends that the Supreme Court has more recently provided guidance to the contrary

in Southern Union Co. v. United States, 567 U.S. 343, 347–50 (2012), but that case is clearly distinguishable. There, the Supreme Court evaluated a statute that imposed a $50,000 fine for each day of violation and found that because each day increased the statutory maximum fine, the jury was required to find the number of days the defendant was in violation. Id. The MVRA, however, has no statutory maximum amount and instead tasks the district court with determining the factual amount of loss. 18 U.S.C. § 3663A(b). As a result, in the MVRA context "a judge cannot find facts that would cause the amount to exceed a prescribed statutory maximum." United States v. Bengis, 783 F.3d 407, 412 (2d Cir. 2015) (emphasis added). While this court has not re-evaluated its reasoning in Milkiewicz since Southern Union was decided, several other courts of appeals have already concluded that Southern Union does not overrule their previous holdings that Apprendi does not apply to restitution calculations.[2] See United States v. Sawyer, 825 F.3d 287, 297 (6th Cir. 2016); United States v. Thunderhawk, 799 F.3d 1203, 1209 (8th Cir. 2015); Bengis, 783 F.3d at 412–13; United States v. Rosbottom, 763 F.3d 408, 420 (5th Cir. 2014); United States v. Green, 722 F.3d 1146, 1149–50 (9th Cir. 2013); United States v. Wolfe, 701 F.3d 1206, 1216–17 (7th

---

[2] For the contrary argument, see William M. Acker, Jr., The Mandatory Victims Restitution Act Is Unconstitutional. Will the Courts Say So After Southern Union v. United States?, 64 Ala. L. Rev. 803 (2013).

Cir. 2012); United States v. Day, 700 F.3d 713, 732 (4th Cir. 2012).

The district court's decision to follow the approach espoused in Milkiewicz, which accords with the more recent decisions of our sister circuits, was not plain error.

**2.**

Moving on from Apprendi, both defendants challenge whether it was reasonable for the district court to use the ostensibly fair prices from the 2016-2017 auction as a benchmark for what fair prices would have been in the 2013-2014 auction. Vega-Martínez makes two primary arguments on that point. First, he argues that there were no losses because after the renegotiation process the municipality ultimately did not pay more than it had initially budgeted for the routes. This first argument falls flat. The fact that the municipality might have been able to afford higher prices than it paid in 2014, even if true, does not preclude the likelihood that it would have paid less had there been a fair auction, which is the relevant question. Along those same lines, Vega-Martínez also argues that he "[h]ad been servicing the same route for around 27 years for basically the same price" that was reached in 2014. But that is not the proper measure either. The municipality presumably opened up the auction in the hope that it could get lower prices, as it was entitled to do and as it did for 2017. Prices from previous years thus are not a legally

dispositive benchmark -- especially when those previous years' prices were not decided by auction.

Second, Vega-Martínez argues that the government failed to present any evidence to show that there were other companies and drivers available and willing to provide the services for less in 2014. This second argument is better but ultimately not persuasive. As Vega-Martínez points out, neither of the two cooperating witnesses testified that they would have bid on the routes in question but for the agreement reached at the bid-rigging meeting. There was thus no express evidence to establish that market conditions were equivalent between 2013 and 2016. To back up this point, Garay-Rodríguez points to a provision in the MVRA that allows courts not to award restitution where determining the loss amount would "complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Although the government interprets this provision to suggest that district courts should not concern themselves with complex facts when awarding restitution, it actually suggests that restitution should not be awarded when it is too difficult to estimate accurately. That is, where the facts are too difficult to discern, the sentencing court's option is to

forgo restitution, not to fall back on a factually unsupported calculation method.[3]

That being said, "calculation of restitution is not held to standards of scientific precision." United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013). Absent evidence to the contrary, it was permissible for the court to assume that market conditions were roughly equivalent between 2013 and 2016. Only three years passed between the two auctions, and the defendants point to no intervening events that would have seriously disrupted the supply of or demand for bus servicing in that span of time.[4]

Vega-Martínez also argued below that "[t]he routes that were served by [his company] are currently served differently." In particular, he contended that a provider who obtained a route for 2017 used a different number of buses and picked up a different number of students than he had. But Vega-Martínez provided no

---

[3] See Jennifer Gerarda Brown, Robbing the Rich to Feed the Poor, 3 Buff. Crim. L. Rev. 261, 275–81 (1999); see, e.g., United States v. Fountain, 768 F.2d 790, 802 (7th Cir. 1985) (Posner, J.) (applying the Victim and Witness Protection Act's parallel complexity exception to reverse a grant of lost future earnings to a murdered prison guard's family because "projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute" and such an "elaborate damage calculation requiring expert testimony" was too complicated for the sentencing context (emphasis omitted)).

[4] Hurricane Maria did not land on the island until September 2017, for example.

direct evidence of those contentions. While he did include affidavits from community members about their experiences with the busing services post-2017, the affidavits failed to include any detailed information about the routes.

Absent an evidence-supported argument from the defendants that the routes auctioned for 2017 were materially different than those for 2014, the district court was entitled to presume that the two auctions were for approximately the same services in pretty much the same market.

## III.

For the reasons explained above, the defendants' convictions and restitution requirements are <u>affirmed</u>.